William C. WHITE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1592.

Court of Appeals of Alaska.

April 21, 1989.

OPINION

SINGLETON, Judge.

William C. White was convicted by a jury of one count of burglary in the first degree, AS 11.46.300(a)(1); two counts of robbery in the first degree, AS 11.41.500(a)(1); two counts of assault in the third degree, AS 11.41.220; one count of kidnapping, AS 11.41.300(a)(1)(C); and one count of sexual assault in the first degree, AS 11.41.-410(a)(1). Judge John Bosshard, III, sentenced White to an aggregate term of nineteen years with four years suspended and ordered White to pay the victims $5,000 in restitution. White appeals the judgment and sentence. Pursuant to Alaska Rule of Criminal Procedure 35.1, White also applied for post-conviction relief. Judge Bosshard denied White's application for post-conviction relief.

White raises three issues on appeal: (1) that a pretrial voice identification lineup was unduly suggestive; (2) that Judge Bosshard erred in denying his application for post-conviction relief because his attorney at the voice lineup had a conflict of interest and provided him with ineffective assistance of counsel; and (3) that his sentence is excessive. We affirm White's conviction and deny his application for post-conviction relief, but remand to the trial court for resentencing.

On April 1, 1982, seventeen-year-old D.M. was living with her mother, P.M., in a trailer complex in Valdez. At approximately 10:15 p.m., D.M. heard a knock at the door. When she opened the door, a man wearing a ski mask and carrying a gun forced his way into the trailer. The man asked to see D.M.'s "old man." The intruder then pushed D.M. and P.M. into the back bedroom and made them lie face down, continually demanding that they "give him the dope." Apparently, the intruder was under the mistaken impression that a male drug dealer lived in the trailer.

The intruder taped P.M. with duct tape, and then took D.M. to her bedroom where he bound her with duct tape. According to D.M., the intruder "kept talking all the time," repeatedly asking, "where's your old

Blair McCune and Linda K. Wilson, Asst. Public Defenders, and John B. Salemi, Acting Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

man" and "where's the dope." P.M. agreed with her daughter that the intruder "kept talking all the time."

After taping D.M., the intruder alternately searched the trailer and then returned to D.M.'s room. During this time, the intruder committed a series of offenses leading to the convictions in this case. Significantly, the intruder spoke with D.M. each time he entered her room. After the intruder left, D.M. freed herself and notified the police. When the police arrived, D.M. described the intruder and told the police, "I could identify his voice if I ever heard it again."

The police obtained further information, and on April 2, White was detained in connection with the case. White was interviewed by Patrick M. Shely, Chief of Police for the City of Valdez. Eventually, White requested an attorney. Shely contacted the only attorney available in Valdez. The attorney was also the mayor of Valdez.

White was placed under arrest. *See State v. White*, 707 P.2d 271 (Alaska App. 1985). Shely requested that White participate in a voice lineup. After consultation with his attorney, White decided to participate in the voice lineup.

The voice lineup was arranged through the joint efforts of the police and White's attorney. Officer Rayme L. Vinson prepared a list of nine statements which D.M. and P.M. had said the intruder had repeated the previous night. A dispatch room was arranged for the voice lineup and a partition was placed down the middle of the room, separating the two women from the participants. Six participants, including White and Shely, were brought in and placed behind the partition. Each participant received a copy of the nine statements; Vinson instructed them on the procedure to be followed during the lineup. D.M. and P.M. were then brought into the room. Officer David Mowry instructed the women to give a nonverbal signal if either recognized a voice as the intruder's.

Shely selected the reading order randomly. Each participant read all nine statements. The procedure was then repeated, although the order of the participants was

scrambled from the first reading. Thus, each participant read all nine statements twice. Vinson positioned himself so that he could record the speaker and the reaction of the victims. D.M. and P.M. were positioned next to each other, facing away from the partition.

The first time White read the statements, both women nodded their heads affirmatively, although the women looked at each other as they made the identification. D.M. testified that she recognized the voice after "one or two words at the most. I recognized the voice right off...." P.M. testified that "as soon as we heard his voice, we both looked at each other and nodded our heads because ... we could tell that was the one then." The second time White read the statements, both women nodded again, and this time looked directly to Vinson. After the lineup, both women spoke with Mowry; both indicated they were positive that the voice they identified was the voice of the intruder from the previous night.

## DISCUSSION

█ Prior to trial, White moved to suppress the use of the voice identification lineup. White renews his argument on appeal, arguing that the lineup procedure was unnecessarily suggestive, thus violating his due process rights. In evaluating whether a pretrial identification procedure violates a defendant's due process rights, we follow a two-step analysis. We first ask if the identification procedure is unnecessarily suggestive. If the procedure is unnecessarily suggestive, we then ask if the identification is nevertheless reliable based on the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 108–09, 97 S.Ct. 2243, 2250, 53 L.Ed.2d 140 (1977); *Viveros v. State*, 606 P.2d 790, 792 & n. 1 (Alaska 1980).

█ White alleges that four factors destroyed the validity of the lineup. The first is that Chief Shely was among the participants in the lineup. Although D.M. admitted she had spoken with Chief Shely in the past, D.M. did not recognize any voice in

the lineup other than that of her assailant. Furthermore, P.M. had never spoken with Chief Shely prior to the lineup. Therefore, the fact that Shely participated in the lineup did not render the lineup unduly suggestive.

■ Second, White argues that the lineup was prejudicial because it occurred more than twenty-four hours after the crime. In fact, the lineup occurred approximately twenty-five hours after the crime. This amount of time falls short of the weeks or months which might make a lineup prejudicial. *See Manson*, 432 U.S. at 116, 97 S.Ct. at 2254. We do not believe that this minor delay rendered the lineup unduly prejudicial.

■ Third, White argues that the victims were allowed to collaborate in their identification of his voice. Although it appears that D.M. and P.M. glanced at each other as they made their initial identification of White, neither victim verbalized her thoughts. Furthermore, it appears that both women recognized the voice immediately and independently of each other. Although placing witnesses together during a lineup is not recommended, in this case it was not unduly prejudicial.

■ Finally, White argues that the other lineup participants were white and had white accents, while he is black and has a different accent. The focus of a voice identification should be on the similarity in vocal quality such as tone and accent. *See United States v. Schultz*, 698 F.2d 365, 367–68 (8th Cir.1983); *People v. Vallez*, 80 Cal.App.3d 46, 143 Cal.Rptr. 914, 919 (1978). The trial court was not clearly erroneous in concluding that White's vocal style or accent was not particularly distinctive. Although White's tone was slightly softer than the other participants, White possessed no peculiar vocal quality which would render the lineup impermissibly suggestive.

■ Even if any part of the lineup was impermissibly suggestive, the identification was reliable based upon the totality of the circumstances. The Alaska Supreme Court has noted that "the test is whether such identification is reliable, as weighed against the corrupting effect of the suggestive identification itself." *Holden v. State*, 602 P.2d 452, 456 (Alaska 1979). In determining the reliability of a visual identification, the Alaska Supreme Court has followed the United States Supreme Court in setting forth five factors. These factors, which are equally applicable to an auditory lineup, include: (1) the opportunity of the witness to hear the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Walker v. State*, 652 P.2d 88, 95 (Alaska 1982); *Holden*, 602 P.2d at 456.

In this case, both victims had ample opportunity to hear the intruder at the time of the crime. Second, both witnesses had time and opportunity to focus their attention on the intruder's voice. Third, prior to the lineup, both D.M. and P.M. had told the police that they could identify the voice. Fourth, both D.M. and P.M. expressed certainty that White's voice was the voice of the intruder. D.M. stated, "I was sure that was the voice." P.M. said that there was no doubt in her mind that the voice she identified was the voice she had heard in the trailer. Finally, as already noted, the time between the crime and the confrontation was only twenty-five hours. Thus, the reliability of this identification outweighs any possible suggestiveness.

White's second argument is that the lower court erred in failing to grant his application for post-conviction relief. First, White contends he was denied the effective assistance of counsel. Specifically, White argues that his attorney at the voice lineup had a conflict of interest because he was the mayor of Valdez.

■ A conflict of interest may result from a variety of situations. As in this case, a "professional" conflict of interest may result when an attorney's second profession or outside activities interfere with the attorney's undivided assistance in a

case. In contrast, the more typical conflict of interest, multiple representation, may result from the joint representation of co-defendants by a single attorney.

The law is unsettled as to a defendant's burden when the defendant alleges that his attorney has a professional conflict of interest. However, the United States Supreme Court has established guidelines for multiple representation conflict of interest cases. In *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980), the Supreme Court held, "[T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his sixth amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." We have already adopted the *Cuyler* standard in conflict cases resulting from multiple representations. *See LaPierre v. State,* 734 P.2d 997, 1003–04 (Alaska App.1987); *Wilson v. State,* 711 P.2d 547, 549 (Alaska App.1985).

White now urges that we follow the Illinois courts and distinguish between a professional conflict of interest and a conflict based upon multiple representation. In *People v. Washington,* 101 Ill.2d 104, 77 Ill.Dec. 770, 461 N.E.2d 393, 394–95 *cert. denied,* 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367 (1984), the Illinois Supreme Court restricted the *Cuyler* standard to multiple representation cases and adopted a *per se* standard of reversal in professional conflict of interest cases. We decline White's invitation and will follow the *Cuyler* standard in professional conflict of interest cases. This position is within the weight of prior federal authority. *See United States ex rel. Duncan v. O'Leary,* 806 F.2d 1307, 1312–13 (7th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987). *See also Illinois v. Washington,* 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367 (1984) (three justices dissenting from denial of *certiorari* discuss the Illinois split and note that "numerous" federal courts have not limited *Cuyler* to cases of joint representation). We agree with these federal authorities.

■ We do not find that White's attorney was laboring under an actual conflict of interest. Even if we were to find a "symbolic conflict," we would follow *Cuyler* and would conclude that White has not persuaded us that he suffered any detriment because of his attorney's relationship with the City of Valdez. The City of Valdez operates under a city manager form of government. The mayor of Valdez is simply elected to preside over the city counsel. Furthermore, the Valdez City Charter prohibits city counsel members from interfering with the hiring or firing of city personnel. *See* Valdez City Charter § 5.3a(j). It appears that the city counsel could become involved with the police on a budgetary matter or in matters involving complaints that the police had established a pattern of acting unprofessionally. However, this case involved neither of these matters. As *Cuyler* held, "the possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719. Second, White's attorney had no professional employment with the state as an attorney. Third, White's attorney had handled "hundreds" of prior criminal cases and had maintained a "very competitive" relationship with the police. Finally, we note that there are only a limited number of practicing attorneys in rural Alaska communities. To disqualify those attorneys with only symbolic connections to the state from providing a legal defense to those who need their services would hamper the administration of justice and may infringe on the accused's right to an attorney.

In his application for post-conviction relief, White alleges an additional reason to support his claim of ineffective assistance of counsel at the voice lineup. Specifically, White argues that his attorney was ineffective in leaving the decision of whether or not to participate in the voice lineup solely to the discretion of White. White notes that his attorney was aware that White had made a statement indicating that he could not recall the events of the prior evening.

■ In determining ineffective assistance of counsel claims, we follow a two-pronged analysis. *Risher v. State,* 523

P.2d 421, 424 (Alaska 1974); *State v. Jones,* 759 P.2d 558, 567–68 (Alaska App.1988). The first prong is an objective standard, requiring the defendant to prove that defense counsel's conduct fell below that of a lawyer with ordinary training and skill in the criminal law. *Risher,* 523 P.2d at 424; *Jones,* 759 P.2d at 567. The second prong requires a showing of prejudice, or "a showing that the lack of competency contributed to the conviction." *Risher,* 523 P.2d at 425. While this test closely mirrors the Supreme Court test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), there is one distinguishing factor. In the prejudice prong, *"Risher* requires only that the accused create a reasonable doubt that counsel's incompetence contributed to the conviction, [while] *Strickland* requires that a reasonable probability of a different outcome be established." *Jones,* 759 P.2d at 572 (citation omitted).

■ In the instant case, we do not find that the actions of White's attorney were ineffective. White's attorney fully informed him of the pros and cons and the legal consequences of the decision. Counsel explained that if White's voice was identified, it would be additional evidence against him; if his voice was not identified, it would be favorable evidence for him. Furthermore, when White suggested he would like to prove his innocence, counsel stopped White and fully informed him on the presumption of innocence and the burdens of proof. After counsel believed he had explained every aspect of the decision, White still felt it was best to go forward with the lineup. Finally, White has not demonstrated prejudice because even if he had refused the voice lineup, it appears likely that the police could have obtained a court order requiring his participation. *See* Alaska R.Crim.P. 16(c). Under these circumstances, counsel's assistance cannot be found ineffective.

White's final argument is that his sentence is excessive. White received an aggregate sentence of nineteen years with four years suspended. The sentence included: Count I (first-degree burglary), three years; Counts II and III (first-degree robbery), six years on each count, concurrent to each other but consecutive to Count I; Counts IV and V (third-degree assault), two years on each count, all suspended, consecutive to the above counts; Count VI (kidnapping), five years concurrent to the above counts; and Count VII (first-degree sexual assault), six years, consecutive to the above counts. In 1982, the robberies and the sexual assault were class A felonies and, because a firearm was used, were subject to six-year presumptive terms. *See* former AS 12.55.125(c)(1). White was also ordered to pay $5,000 in restitution.

■ White first argues, and the state agrees, that the restitution order must be set aside because the trial court made no findings regarding White's earning capacity or ability to pay and made no findings regarding the victim's actual amount of damages. *See Karr v. State,* 686 P.2d 1192, 1196–97 (Alaska 1984); AS 12.55.-045(a); AS 12.55.100(a)(2). We agree that the record does not reflect any such findings by the trial court. Thus, the restitution order must be vacated.

■ White's second argument is that the trial court failed to make a finding that imposition of consecutive sentences was necessary to protect the public. *See Lacquement v. State,* 644 P.2d 856, 860–62 (Alaska App.1982). The state argues that this finding is no longer required after our decision in *Jones v. State,* 744 P.2d 410 (Alaska App.1987).

We have recently reviewed this line of cases and the question of consecutive sentences in *DeGross v. State,* 768 P.2d 134 (Alaska App.1989). In that case, we noted that it is important for the sentencing court to consider similarly situated offenders, particularly in the case of a first felony offender. *Id.* at 139. In cases involving first felony offenders, we noted a benchmark sentencing range of ten to fifteen years for crimes involving multiple sexual assaults. In cases involving various types of class A and class B felonies, we expressed reluctance to approve any sentence involving a total of more than ten years' unsuspended incarceration. We pointed out that only in the most unusual cases have we approved sentences beyond the benchmark. *Id.* at 139–140.

We find that White's case is similar in its facts to *Smothers v. State*, 579 P.2d 1062 (Alaska 1978). In that case, Smothers and two companions broke into a residence and tied up the three female occupants. Two of the occupants were struck with a gun, and the burglars remained at the residence for approximately two hours. *Id.* at 1063. At the time of the offense, Smothers was twenty years old. He was on probation and had an extensive prior record. Although the court noted that his twelve-year sentence was severe, it affirmed the sentence.

In this case, we note that White was a twenty-four-year-old first felony offender at the time of the crime. White's only prior offenses were nine minor traffic citations. Since the charges in this case, White has maintained a good record. Prior to the offense, White was steadily employed. White has maintained the support of friends and family. In its sentencing remarks, the court did not find that White needed a sentence of more than ten years for purposes of community protection or isolation. Instead, the trial court ruled, "The court imposes this sentence for the purpose of deterring others from committing similar crimes." In our view, a sentence in excess of ten years could only be justified by the need for isolation.

We have concluded that White's sentence must be vacated and the case must be remanded for resentencing. The sentencing court should enter findings consistent with our opinion in *DeGross*. The total of consecutive sentences should not exceed ten years, absent a finding of a need for isolation.[1]

The conviction is AFFIRMED. The sentence is VACATED and the case is REMANDED for resentencing.

---

1. We recognize that White was convicted of kidnapping, an unclassified felony, AS 11.41.-300(a)(1)(C). It does not appear that the trial judge considered the kidnapping particularly aggravated. This case is therefore distinguishable from *Garrison v. State*, 762 P.2d 465 (Alaska App.1988). Rather, he seems to have viewed the kidnapping as aggravating White's other offenses. We have therefore treated this case as primarily a serious sexual assault and robbery aggravated by the burglary of the victims' home and the prolonged restraint of the victims.