**Robert C. SHARP, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3068.**

Court of Appeals of Alaska.

July 17, 1992.

George E. Weiss, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

OPINION

MANNHEIMER, Judge.

Following a jury trial in the Anchorage superior court, Robert C. "Chris" Sharp was convicted of four counts of sexual

abuse of a minor in the first degree, AS 11.41.434(a), and one count of felony failure to appear, AS 12.30.060(1). The sexual abuse charges were premised on Sharp's molestation of four young girls, J.B., S.E., M.P., and J.G., all of whom had been entrusted to Sharp's mother, a day-care provider. Following his indictment, Sharp fled Alaska after manufacturing an apparent suicide in Turnagain Arm. (Sharp's parents were his accomplices in this endeavor: *see Jean and Homer Sharp v. State*, Memorandum Opinion No. 2370 (Alaska App., March 11, 1992)). This effort to avoid prosecution resulted in Sharp's indictment for failure to appear.

Sharp appeals both his convictions and his sentence. We affirm.

Sharp lived with his parents, Homer and Jean Sharp. The elder Sharps ran a day-care center out of their home. Sharp's mother was the primary care taker; however, when she was absent or was not feeling well, Sharp would take over.

J.G. started attending Jean Sharp's day-care center in December 1982, when she was six months old. Around November 1984, J.G. complained that her "butt" hurt; J.G. used the word "butt" to refer to both her vaginal and anal areas. J.G.'s mother noticed that her daughter's vaginal area was red and irritated. Her doctor told her that this was common with small girls who were inexperienced in wiping themselves after using the toilet. Mrs. G brought the vaginal irritation to the attention of the Sharps, who speculated that it might be due to the soap they were using to bathe J.G.

Six months later, J.G. complained to her mother that "Chris" was putting soap on her butt and making it sore. Then, in November 1985, after watching her father urinate, J.G. declared that "Chris has a monster in his pants ... just like Daddy". J.G. then reiterated that Chris put soap on her butt and made it sore. J.G.'s mother immediately withdrew her from the day-care center.

Sharp's trial was held almost three years later, in September 1988. At that time, J.G. was six years old. When J.G. testified at trial, she remembered being at the Sharps' home but could not remember anything about the sexual abuse, nor could she remember telling her mother any of the things Mrs. G. had testified to. J.G. also failed to identify Sharp when he was pointed out to her.

To support its allegation that J.G. had been sexually abused, the prosecution presented the testimony of Dr. Clinton Lillibridge, a pediatrician who had examined J.G. on November 18, 1987. The doctor testified that young girls normally have a round hymenal opening of three to four millimeters in diameter. However, J.G.'s hymen had an irregular opening, about nine millimeters wide and six millimeters in height, with a deep tear on one side. Dr. Lillibridge stated that this deformity and injury had probably been caused by a repeated, forceful penetration by an object the size of a finger. He concluded that the condition of J.G.'s hymen was consistent with its being penetrated by a man's finger when she was two to three years old.

Another child, S.E., started attending the Sharps' day-care center when she was six months old and continued attending until she was about two and one-half years old. On Friday, August 7, 1987, S.E. spent the day at the Sharps' and then was going to spend the night at the house of one of her friends, M.P.. When M.P.'s mother came to pick up the two children from the day-care center, she heard them talking about how Sharp had touched them.

B.P., M.P.'s mother, testified that when she picked M.P. and S.E. up on August 7, 1987, M.P. told her, "Chris hurt [S.E.] and she was crying." S.E. did not want to talk about the incident, but she indicated that Chris had hurt her. B.P. asked M.P. if Chris had hurt her too, and M.P. responded, "He hurt me a long time ago." B.P. notified S.E.'s mother, and the two women called the police.

At Sharp's trial, S.E. identified Sharp as a "big boy" who had babysat her and other children at his house. S.E. said that Sharp had touched her. According to S.E., Sharp told all the other children to go upstairs and take a nap, but he kept S.E. and anoth-

er girl downstairs. Sharp then put a blanket over S.E.'s head; when she cried, he told her to be quiet. Sharp removed S.E.'s shorts and underwear and threw them in the bathroom; then he put lotion on her private parts. S.E. stated that when Sharp touched her private parts it felt cold and then hot. S.E. said that the thing touching her did not feel like a man's hand or finger. S.E. did not remember feeling any pain, and said it was hard to tell if he put anything inside her.

Later that same day, S.E. told her friend, M.P., about the touching, and M.P. told her that Chris had done it to her lots of times.

M.P. attended the Sharps' day-care center from June 1984 until August 1987. M.P. testified that Sharp had hurt her in the bathroom lots of times with a white "needle" that was about six inches long. She stated that the white needle had a "circle end" and that its front was sharp. M.P. said Sharp would fetch this object from a shelf in his room; he then would get lotion and get "ready to do it." Sharp would put the lotion on her private parts and "rub it around." Chris would then poke the needle in M.P.'s private parts; M.P. said that this hurt her "really bad". M.P. said that Sharp would not stop when she asked him to; when she cried, Sharp would tell her to be quiet.

M.P. failed to identify Sharp at trial, even after he was pointed out to her. M.P. later identified the "white needle" as an electric toothbrush holder. She also identified a bottle of Keri lotion as being the one used during the sexual abuse.

M.P. and S.E. were taken to Humana Hospital where they were examined by Dr. Mark Moeller. Dr. Moeller asked each of the girls what had happened to them.

M.P. told Dr. Moeller, "Chris poked something into me where I go pee," pointing toward her genitals. Dr. Moeller found that M.P.'s vaginal opening was larger than normal and that it was a bit of red. Dr. Moeller testified that M.P.'s injury was consistent with her having been penetrated with an object the diameter of a dime, and that it probably had occurred from several days to a week earlier.

S.E. also told Dr. Moeller that Chris put something into her where she pees. When she pointed to her genitals, S.E. started crying and grabbed her mother. Dr. Moeller testified that S.E.'s hymen was approximately five to six millimeters wide, and that, in his training, four millimeters was the upper normal limit. He also noted that S.E.'s labia majora and minora were irritated from a fairly recent occurrence, within the previous twenty-four hours. Dr. Moeller believed that this irritation was consistent with S.E.'s being penetrated by a foreign object, and not just the result of an abrasion or irritation.

The fourth victim, J.B., attended the Sharps' day-care center from June 1987 until August 10, 1987. In late July, J.B.'s mother asked her if anyone "had been messing with her." J.B. responded, "Yes, Chris." However, J.B. dropped the subject immediately, leaving her mother unsure whether J.B. had been truthful. When J.B.'s mother went to pick her up on August 10, Jean Sharp told her about allegations that her son had molested some of the children in her home. Later that day, J.B. told her mother that Chris Sharp had pulled her pants down once but had never taken her underwear off. J.B. stated that Chris rubbed his penis on her leg when she was wearing only underwear and that he was trying to mess with her "gina".

At Sharp's trial, J.B. testified that Sharp had touched her genitals with his hand, that it hurt her when he did this, and that she hated it. She stated that Sharp had done this one time when everyone else was out of the house. J.B. was uncertain whether or not Sharp put his hand inside her, and she stated that her panties never came off. When asked whether or not she had told her mother that she had seen Sharp's penis, J.B. first denied it and then admitted it. When asked if this incident had truly happened, J.B. said yes, but then she added that Sharp had never taken his private part out of his pants in front of her.

Dr. Lillibridge examined J.B. on August 13, 1987. When he started to examine J.B.'s vaginal area, she became apprehensive and needed reassurance from her

mother. This reaction is abnormal in a child J.B.'s age but is observed in children who have been sexually abused.

J.B.'s hymenal opening was irregular and jagged, not a normal round opening. To Dr. Lillibridge, this indicated that something the size of an adult male finger had penetrated J.B. more than two days before the exam. The doctor testified that J.B.'s injury was not consistent with rough-housing, washing of the genitals, or masturbation.

Sharp was initially charged with three counts of sexual abuse of a minor for the incidents involving S.E., M.P., and J.B.. Later, count IV was added for the sexual abuse of J.G..

Sharp's trial was scheduled for May 31, 1988. On May 20, 1988, Anchorage Police Officer Hans Roelle was given a jacket that had been found at McHugh Creek. The jacket contained a letter and Sharp's driver's license. Roelle went to Sharp's house to return the jacket. There, he met Jean and Homer Sharp; the elder Sharps acted peculiarly about the jacket but would not respond to Roelle's questions except to tell him that Sharp was on bail release for a felony charge.

The following day, Officer Barry Croy was dispatched to meet Homer Sharp at the Potter Marsh Weigh Station. Homer Sharp told Croy that he had found a car which he believed his son had been driving; he said that the car was locked but there appeared to be a note in the front seat. Croy helped Homer Sharp unlock the car; inside, they found a suicide note, apparently written by Sharp, and an empty bottle of whiskey. The police began searching for Sharp. Jean Sharp soon arrived. Both she and Homer told the police that they thought their son had walked into the inlet or been kidnapped and killed by drug dealers.

On May 23, 1988, the prosecutor learned that Sharp was missing and she obtained a bench warrant for his arrest. On May 31, Sharp did not appear for trial. The trial date was vacated but the bench warrant continued in effect.

Three weeks later, on June 14, 1988, Sharp was located and arrested in Charleston, South Carolina. He was returned to Anchorage on June 27, 1988, and was indicted on a fifth count, felony failure to appear. As noted above, Sharp was convicted on all five counts.

■ Sharp's initial argument on appeal is that he received ineffective assistance from his trial attorney. Sharp has never litigated this claim in a petition for post-conviction relief under Criminal Rule 35.1. Claims of ineffective assistance can rarely be determined from the trial record alone. An attorney's actions are presumed competent. *Risher v. State*, 523 P.2d 421, 424 (Alaska 1974); *State v. Jones*, 759 P.2d 558, 567–570 (Alaska App.1988). Moreover, an attorney's trial decisions—including which potential defenses to pursue, whether to object to the evidence offered by the government, how to cross-examine government witnesses, and whether and how to present a defense case—generally rest on considerations of strategy and trial tactics that are not directly addressed in open court. For these reasons, this court will seldom entertain an ineffective assistance of counsel claim raised for the first time on appeal. *Barry v. State*, 675 P.2d 1292, 1295–96 (Alaska App.1984).

Sharp acknowledges this general rule but nevertheless asks us to address his various claims of attorney incompetence as matters of plain error. With one exception, we find that Sharp has failed to adequately brief his claims of ineffective assistance; his brief to this court mentions various claims of attorney incompetence in passing, but Sharp fails to provide substantive legal discussion of how each instance might demonstrate ineffective assistance of counsel. *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 411 & n. 8 (Alaska 1990).

The one exception is Sharp's claim that his trial attorney incompetently failed to object to Dr. Lillibridge's testimony that a hymenal opening of greater than four millimeters strongly indicates that a child had been sexually abused. We find that Sharp's discussion of this point is adequate

to allow meaningful appellate review. We therefore decide this claim of ineffective assistance, but we decline to reach the merits of Sharp's other allegations of ineffective assistance of counsel.

As described above, Dr. Lillibridge testified at Sharp's trial, without objection, that if a child has a hymenal opening greater than four millimeters' diameter, this is substantial evidence of sexual abuse. Sharp argues that Dr. Lillibridge's opinion is inadmissible under the test for scientific evidence announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), and adopted in *Pulakis v. State,* 476 P.2d 474, 478 (Alaska 1970). *See also Contreras v. State,* 718 P.2d 129, 134–36 (Alaska 1986). That is, Sharp asserts that most practitioners of pediatric medicine do not recognize the validity of inferring sexual abuse from the size of a child's hymenal opening.

■ Because no objection was made to Dr. Lillibridge's testimony at Sharp's trial, we review the challenged testimony under a plain error standard. To demonstrate plain error, Sharp must show that no competent judge or attorney could have failed to see that Dr. Lillibridge's opinion fell outside the realm of generally accepted medical judgments. *Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985); *Marrone v. State,* 653 P.2d 672, 675–681 (Alaska App.1982). Sharp has not demonstrated this.

Dr. Lillibridge testified that the "Cantwell study", a survey of children's hymenal openings, found that among children with hymenal openings greater than four millimeters' diameter, 80 percent had been sexually abused. Dr. Lillibridge also testified that the American Medical Association's Council on Practice had published findings that supported the Cantwell study's conclusion. Dr. Lillibridge further testified that his own examinations of thousands of children during his quarter-century career as a pediatrician corroborated the medical literature's four-millimeter benchmark.

. During cross-examination by Sharp's attorney, Dr. Lillibridge explained that an enlarged hymenal opening does not conclusively establish sexual abuse, but the medical profession views an enlarged opening as evidence of abuse. Dr. Lillibridge's testimony was supported by the later testimony of Dr. Mark Moeller; Dr. Moeller stated (again, without objection) that, according to his medical training, a hymenal opening greater than four millimeters in diameter is abnormal.

Given this record, Sharp has failed to show plain error in the admission of Dr. Lillibridge's testimony that a hymenal opening of greater than four millimeters' diameter was abnormal and that sexual abuse might be inferred from an abnormally enlarged hymenal opening.

■ Sharp's second argument on appeal concerns his challenge to a prospective member of the jury. During jury selection, Sharp challenged seven members of the venire for cause; the superior court granted six of these challenges and denied one. On appeal, Sharp argues that this one denial constituted an abuse of discretion.

To obtain reversal of a judgement because of an assertedly erroneous ruling on a challenge to a prospective juror, Sharp must show "that he has exhausted his peremptory challenges and has suffered material injury from the action of the court"— i.e., "that as a result [of the court's ruling] one or more objectionable jurors sat on the case". *Bohna v. Hughes, Thorsness, Gantz, Powell, & Brundin,* 828 P.2d 745, 762 (Alaska 1992). Sharp cannot show that he was prejudiced by the trial court's ruling. Sharp used only four of his peremptory challenges during jury selection; he accepted the panel when he still had six peremptory challenges remaining. *See* Alaska Criminal Rule 24(d). Because Sharp could have used one of his remaining peremptory challenges to remove the juror in question, Sharp was not prejudiced by the superior court's denial of his challenge for cause.

■ Sharp next argues that the superior court erroneously allowed various witnesses (parents and doctors) to testify concerning out-of-court statements made by the four victims. We find that Sharp has not sufficiently briefed this issue to preserve it for appeal. Sharp's brief does not identify

the particular statements he believes should have been excluded. Our review of the record shows that Sharp did not object to much of this testimony. Further, it is clear that at least some of the victims' statements were not hearsay at all. For example, J.G.'s statement that "Chris has a monster [i.e., a penis] in his pants" was not introduced to prove the matter asserted; rather, this statement was circumstantial evidence that sexual abuse had occurred (by tending to prove that J.G. had seen Sharp's penis). Alaska Evidence Rule 801(c). Finally, Sharp's discussion of the governing law is sketchy at best. He asserts in a conclusory manner that the identity of a child's sexual abuser can never be established through hearsay statements of the victim—an overbroad assertion with several exceptions.

For these reasons, we decline to reach the merits of Sharp's challenge to the testimony describing out-of-court statements of the four victims. *Bohna v. Hughes, Thorsness, supra; Kristich v. State*, 550 P.2d 796, 804 (Alaska 1976); *Gudmundson v. State*, 763 P.2d 1360, 1362 (Alaska App. 1988).

■ Sharp's final attack on his conviction concerns the superior court's decision to join the five counts for trial. On March 4, 1988, Sharp moved for severance of Count IV, the abuse of J.G., on the ground that it was dissimilar and unconnected to the other three sexual abuse charges, and because it was remote in time from the other charges. Judge James A. Singleton, sitting as a superior court judge, granted Sharp's motion, relying on *Johnson v. State*, 730 P.2d 175 (Alaska App.1986). In *Johnson*, this court held that a defendant was entitled to automatic severance upon request when the sole basis for joinder was the similar nature of the charged offenses, even when the evidence of the various charges would be cross-admissible at separate trials.

However, on May 28, 1988 (three days before Sharp's original trial date), the legislature amended Alaska Criminal Rule 8(a). Ch. 66, §§ 8–9, SLA 1988. Rule 8(a) now allows joinder of similar offenses if the government can demonstrate before trial that evidence of each offense will likely be cross-admissible. The legislature's declared intent was to overrule *Johnson* and "permit multiple offenses to be joined for trial when evidence of one offense is admissible to prove another." 1988 House Journal at 2332.

As explained above, Sharp's original trial date was vacated when he fled Alaska. When Sharp was recaptured, his trial was set for the end of August. On August 22, 1988, a week before trial, Sharp moved to sever the four remaining joined counts (Counts I, II, III, and V). The state opposed this motion and responded with a motion to rejoin Count IV in light of the amendment to Criminal Rule 8(a). Superior Court Judge Peter A. Michalski ordered all five counts joined for trial. Sharp moved for reconsideration of joinder at the end of the State's case; this motion was denied.

A trial court's decision on joinder or severance is not to be disturbed absent an abuse of discretion and a showing of prejudice. *Abdulbaqui v. State*, 728 P.2d 1211, 1218–19 (Alaska App.1986). The current version of Criminal Rule 8(a), when read in conjunction with Criminal Rule 13, provides:

**Joinder of Offenses.** Two or more offenses may be [joined for trial] if the offenses charged, whether felonies, misdemeanors or both,

(1) are of the same or similar character and it can be determined before trial that it is likely that evidence of one charged offense would be admissible to prove another charged offense,

(2) are based on the same act or transaction, or

(3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Sharp mistakenly argues that he was entitled to automatic severance of Counts I through IV under *Johnson*. As just explained, the *Johnson* decision was overturned by the legislature. Moreover, even if Sharp's case had been governed by the

previous version of Rule 8(a) and the holding in *Johnson*, joinder would still have been proper.

The automatic severance rule of *Johnson* applied only when the sole basis for joinder was the first clause of Rule 8(a)—similar offenses. There was no automatic severance when joinder was premised on the second or third clauses of the rule—offenses based on the same transaction, or based on related transactions constituting parts of a common plan or scheme. *Yearty v. State*, 805 P.2d 987, 991 (Alaska App. 1991); *Newcomb v. State*, 800 P.2d 935, 943 (Alaska App.1990). Sharp's sexual abuse of the four children took place at his mother's day-care center; Sharp apparently used his position as chief lieutenant at the day-care center to obtain access to young children. Thus, Sharp's acts of abusing several young children could reasonably be viewed as separate instances of a common scheme or plan. See *Oswald v. State*, 715 P.2d 276, 279–280 (Alaska App.1986), where this court held that evidence of the defendant's sexual propositions to various teenage girls could be admitted under Evidence Rule 404(b) as evidence of his plan or scheme to exploit his position as a "counselor" to run-away teenagers.

■ Even though Criminal Rules 8(a) and 13 allow joinder of two or more charges, a defendant can nevertheless obtain severance under Criminal Rule 14 by showing that the jury's ability to fairly decide the individual charges will be substantially impaired if the jury hears evidence relating to other charges at the same time. Sharp argues that this was true in his case.

However, one of the issues litigated at Sharp's trial was identity—that is, whether, assuming the children had been abused, Sharp could be identified beyond a reasonable doubt as the one who had abused them. Sharp's sexual abuse of various children attending his mother's day-care center would have been admissible, even at separate trials, on the issue of identity. *Yearty*, 805 P.2d at 991. Judge Michalski so found when he denied Sharp's motion for reconsideration of the joinder issue.

■ This leaves Count V, the charge of failure to appear. As this court noted in *Newcomb*, 800 P.2d at 943, evidence of Sharp's feigned suicide and flight from Alaska was relevant to deciding whether he had been the one who sexually abused the children. Conversely, evidence of Sharp's sexual abuse of the children was relevant to deciding what his intent and motivation were when he failed to appear for his trial.

Sharp has not shown that Judge Michalski abused his discretion when he ordered the five counts joined for trial.

■ We turn now to Sharp's sentencing arguments. The portion of Sharp's brief that deals with his sentence is devoted mainly to arguing that he received ineffective assistance of counsel at sentencing. For the reasons explained above, we decline to reach this claim. The remaining claim is Sharp's argument that his sentence is excessive.

For his four sexual abuse convictions, Sharp was sentenced to a composite term of 32 years with 16 years suspended. Judge Michalski imposed a consecutive 1 year's imprisonment for Sharp's failure to appear, making a total sentence of 17 years to serve and another 16 years suspended.

Sharp was a first felony offender who was convicted of sexually abusing four children; the evidence indicated that he had abused the children many times over a period of two years or more. In *State v. Andrews*, 707 P.2d 900 (Alaska App.1985), *aff'd* 723 P.2d 85 (Alaska 1986), this court recognized a benchmark sentencing range of 10 to 15 years to serve for first offenders convicted of aggravated instances of child sexual abuse. This court defined an "aggravated" case as one in which the defendant had abused multiple victims, or had committed multiple assaults on a single victim, or had inflicted serious injury to one or more victims. *Andrews*, 707 P.2d at 913–14.

For example, in *Koenig v. State*, the companion case decided in *Andrews*, the defendant was a public school teacher who sexually abused several 8- and 9-year-old children. Because Koenig had been in a

position of authority over his victims, because the children were particularly vulnerable due to their youth, and because Koenig had abused several children, this court concluded that his case was aggravated and approved a sentence of 15 years to serve with an additional 5 years suspended. *Andrews,* 707 P.2d at 911, 917.

Sharp relies on *White v. State,* 773 P.2d 211, 217–18 (Alaska App.1989), for the proposition that first offenders should rarely receive sentences of more than 10 years' imprisonment. However, the 10–year ceiling mentioned in *White,* and actually announced in *DeGross v. State,* 768 P.2d 134, 139–140 (Alaska App.1989), and *Pruett v. State,* 742 P.2d 257, 265–66 & n. 10 (Alaska App.1987), applied to first offenders convicted of class A felony offenses. The 10–year rule did not apply to defendants convicted of first-degree sexual abuse of minors, which is an unclassified felony—otherwise, *White, DeGross,* and *Pruett* would have been inconsistent with the benchmark sentencing range announced in *Andrews.*[1] Moreover, the 10–year rule applied in *White, DeGross,* and *Pruett* was expressly disapproved by the Alaska Supreme Court in *State v. Wentz,* 805 P.2d 962, 966 (Alaska 1991).

Sharp's sexual abuse sentences total 16 years to serve, slightly more than the upper limit of the benchmark range announced in *Andrews.* However, on several occasions this court has affirmed sentences of more than 15 years to serve for first offenders in exceptional cases. This court summarized these exceptional cases in *Howell v. State,* 758 P.2d 103, 107 (Alaska App.1988):

> In several exceptionally aggravated cases we have approved sentences in excess of the ten- to fifteen-year benchmark for first offenders. These cases have involved multiple offenses and multiple victims. Even so, we have never approved a first offender sentence of more than twenty years of unsuspended incarceration except when the defendant

used a significant amount of violence, had previously been incarcerated for a substantial period, or both.

For example, in *Lewis v. State,* 706 P.2d 715 (Alaska App.1985), the defendant was a 45–year–old Boy Scout leader who abused two dozen victims over a period of four years. The defendant had no prior record, and he used no violence against the children; moreover, Lewis's victims were older than the ones involved in *Koenig (Andrews).* However, Lewis abused more victims than Koenig, and the abuse occurred over a longer period of time. For these reasons, the Court viewed Lewis's crimes as more aggravated than Koenig's; it held that Lewis's sentence should not exceed 25 years with 5 suspended.

In *Seymore v. State,* 655 P.2d 786 (Alaska App.1982), this court upheld a sentence of 20 years to serve for a defendant who sexually penetrated his stepdaughter on three occasions and who had previously been charged with engaging in sexual contact with her. And in *Qualle v. State,* 652 P.2d 481 (Alaska App.1982), the court upheld a sentence of 21 years for a defendant who had two children perform sex acts with each other and with him, who photographed them so he could sell the pictures to child pornography magazines, and who admitted that he had previously abused his own three children.

Finally, in *Dymenstein v. State,* 720 P.2d 42 (Alaska App.1986), the defendant was an older adult who had engaged in lengthy sexual abuse of a child. He subjected his victim to group sex and had her pose for pornographic photography. The victim suffered severe emotional damage. The sentencing investigation revealed that the defendant had abused two other children as well. Dymenstein refused to admit that any sexual abuse had occurred or that he had any problem—demonstrating a poor prognosis for rehabilitation. *Id.* at 47. This court approved a sentence of 18 years to serve.

---

1. White was, in fact, convicted of kidnapping, an unclassified felony. However, both this court and the superior court which sentenced White treated the kidnapping as a de minimis offense and concentrated primarily on the burglary, robbery, and assaults that White committed. 773 P.2d at 218 n. 1.

█ It is, of course, arguable that Sharp's offenses are not as egregious as the offenses presented in *Lewis* and *Dymenstein.* However, the 10– to 15–year benchmark range established in *Andrews* is not an inflexible rule of law, but rather an historically based starting point for analyzing Sharp's sentence under the particular facts of his case. If there are articulable and valid reasons for imposing a sentence outside that benchmark range, the resulting sentence will not be clearly mistaken. *Williams v. State,* 809 P.2d 931, 933–35 (Alaska App.1991).

Sharp's case shares many of the attributes that led this court to uphold lengthy sentences in *Lewis* and *Dymenstein.* Judge Michalski found that Sharp's offenses were "predatory" in nature; Sharp chose pre-school-age children (3½ to 5 years old) who were particularly vulnerable. Sharp used his position of authority at his mother's day-care center to obtain access to the children. Judge Michalski concluded that the number of Sharp's victims, coupled with the length of time over which he abused them, demonstrated the ingrained nature of Sharp's problem and his correspondingly high level of danger to society. Moreover, throughout the pre-sentence investigation and the sentencing proceedings, Sharp denied that he had engaged in any sexual conduct with the children; Judge Michalski found that Sharp's inability to admit his problem indicated that rehabilitation would be a lengthy process. For these reasons, we conclude that Judge Michalski was not clearly mistaken when he sentenced Sharp to serve 16 years for sexual abuse of the children.

█ We also uphold Judge Michalski's decision to impose a consecutive 1–year term for Sharp's attempt to avoid prosecution by feigning suicide and fleeing Alaska. Sharp's elaborately prepared flight, besides constituting a separate crime, also indicated that he had poor prospects for rehabilitation. Sharp's failure to appear was among the most serious offenses within its class. Sharp's intent was to avoid prosecution on very serious criminal charges. He not only failed to appear in court, but he fled the jurisdiction of Alaska. Hoping to deceive the Alaska authorities into concluding that it was fruitless to pursue him, Sharp manufactured evidence to make it appear that he had committed suicide. Moreover, Sharp enlisted the aid of his parents in this scheme.

The maximum sentence for failure to appear on felony charges is 5 years' imprisonment, AS 12.30.060(1), the same maximum sentence established for class C felonies. The circumstances discussed in the last paragraph suggest a sentence greater than the 1 year's imprisonment Sharp received for this crime. Judge Michalski was not clearly mistaken when he sentenced Sharp to a consecutive 1–year term for failure to appear.

█ This leaves the 16 additional years that Judge Michalski imposed but suspended. This court must examine the propriety of Sharp's entire sentence, including the suspended time. However, in his brief, Sharp addresses himself exclusively to the length of time he must serve; he does not argue that the 16 years of suspended time is excessive. We therefore review this aspect of Sharp's sentence for plain error only. We do not find plain error.

The judgement of the superior court is AFFIRMED.