Jonathan L. ANDERSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8638.

Court of Appeals of Alaska.

Nov. 25, 2005.

**13.** *Id.* at 966.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

In the early morning of July 19, 2001, Jonathan L. Anderson and a female companion, Angela Engstrom, broke into the house of Raymond Ward, where Ward and his girlfriend, N.B., were spending the night. Once inside the house, Anderson pointed a handgun at Ward and N.B., forcing them into a bedroom. After Anderson ordered N.B. to lie on the floor, Anderson placed the gun against Ward's head and demanded money. When Ward did not immediately comply with this demand, Anderson shot Ward in the neck. Ward then surrendered all of his available money (some $140 in cash).

After obtaining this money, Anderson and Engstrom fled the scene in a brown sedan. As explained in more detail later in this opinion, the police located this sedan and chased it through the Fairview area of Anchorage. During this chase, Anderson tossed various articles out of their car, including the handgun that was used in the

shooting, the magazine for this handgun, and a box of matching .45 caliber ammunition.

(A firearms expert later tested this handgun and compared it to the spent bullet that was retrieved from Ward's and N.B.'s house. According to the expert's testimony, the handgun tossed from the car was the weapon that fired this bullet, "to the exclusion of all others".)

At length, the police successfully boxed the sedan into a cul-de-sac, where Anderson and Engstrom were taken into custody. The police then brought N.B. to the scene of this traffic stop to see if she could identify Anderson and Engstrom as the people who broke into her boyfriend's house and committed the robbery. N.B. identified Anderson as the man who broke into the house and shot and robbed her boyfriend, but she could not identify Engstrom as the woman who accompanied him.

Based on these events, Anderson was convicted of first-degree burglary, first-degree robbery, first-degree assault (for wounding Ward), third-degree assault (for threatening N.B. with the handgun), third-degree weapons misconduct (felon in possession of a concealable firearm), and tampering with evidence (for tossing the handgun out of the car during the chase). The superior court sentenced Anderson to a composite 33 years to serve.

Anderson raises three arguments in this appeal.

First, Anderson argues that the superior court should have suppressed all testimony concerning N.B.'s identification of him at the scene of the traffic stop. Anderson contends that the circumstances of this identification procedure were improperly suggestive, thus violating his right to due process of law as construed by the United States Supreme Court in *Neil v. Biggers* and *Stovall v. Denno*.[1]

Second, Anderson argues that even though he tossed the handgun, the magazine, and the ammunition from the sedan during the chase, this conduct does not constitute the

offense of tampering with evidence. The pertinent portion of the evidence tampering statute, AS 11.56.610(a)(1), defines this crime as "suppress[ing], conceal[ing], or remov[ing] physical evidence with intent to impair its verity or availability". Relying on this Court's decision in *Vigue v. State*, 987 P.2d 204 (Alaska App.1999), Anderson argues that he was merely abandoning the gun and the ammunition, not "suppressing" or "concealing" them.

Third, Anderson challenges his sentence. He argues that his composite sentence of 33 years to serve is excessive. He also argues that the sentencing judge committed error by relying on aggravating factors that were premised on the same conduct for which Anderson was separately convicted and sentenced.

For the reasons explained here, we conclude that the superior court properly admitted evidence that N.B. identified Anderson at the scene of the traffic stop. However, we conclude that Anderson's conduct of tossing the articles from the car did not constitute the crime of evidence tampering, and thus his conviction for this crime must be reversed.

We further conclude that Anderson must be re-sentenced, both because we have reversed his evidence tampering conviction, and also because the sentencing judge committed error by relying on aggravating factors that were based on conduct for which Anderson was separately punished.

*The admissibility of evidence concerning N.B.'s identification of Anderson at the scene of the traffic stop*

N.B. identified Anderson in a "show-up"—an identification procedure in which the police display a single suspect to a witness, and the witness is asked whether they can identify this suspect as the person who committed the crime. (In this case, the police had two suspects, a man and a woman (Anderson and Engstrom), and N.B. was asked if she could

---

**1.** *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

identify each of them in turn. However, the principle is the same.)

During the show-up, Anderson was standing outside a patrol vehicle in handcuffs, flanked by two uniformed police officers. Moreover, Anderson is a black man, and N.B. had already told the police that the man who broke into the house was black. As the superior court recognized, these features of the identification procedure tended to suggest Anderson's guilt.

Anderson also contends that, even though N.B. observed the robber face to face, she did not indicate how well, and for how long, she was able to observe the suspect during the crime. Anderson points out that N.B. was told to lie down on the floor, and she later apparently hid in the corner of the bedroom until the assailant left the house. These circumstances, Anderson argues, tend to make it unlikely that N.B. could make a reliable identification of the robber. Anderson also points out that, prior to the show-up, N.B. had not provided the police with a detailed description of the male robber (although she did provide some details concerning his female accomplice).

Finally, Anderson relies on the fact that N.B. was not able to get a good view of his facial features during the show-up. When Anderson was told to get out of the patrol car for the show-up, he would not stand up straight; rather, he insisted on bending over from the waist, so that his face was pointed toward the ground. (Despite Anderson's posture, N.B. told the officers that she could positively identify Anderson as the male robber because of his shaved head and because of his clothing.)

Based on all this, Anderson contends that, under the "totality of the circumstances" approach adopted by the United States Supreme Court in *Manson v. Brathwaite*,[2] this identification procedure was unlawfully suggestive of Anderson's guilt, and therefore the superior court should have suppressed all evidence of N.B.'s identification of Anderson at the show-up.

The State responds that Anderson's argument rests on a misunderstanding of the law in this area. According to the State, there is a two-part test for assessing the admissibility of a show-up identification. First, a court must determine whether a show-up (with its inherent suggestiveness) was necessary under the circumstances. Second, if the show-up was *not* necessary, the court must then determine whether the resulting identification was nonetheless reliable, given the totality of the circumstances as described in *Brathwaite.*

In other words, the State takes the position that the first part of the test requires proof, not just that the identification process was suggestive, but that the process was unnecessarily suggestive. The State also argues that the second part of the test announced in *Brathwaite*—*i.e.* that the witness's identification of the suspect was reliable under the "totality of the circumstances"—comes into play only if the court first decides that, given the facts of the case, it was unnecessary for the police to resort to a show-up as opposed to a less suggestive identification procedure (for example, a multi-person lineup).

Anderson, for his part, contends that the State's understanding of the law is incorrect—that a court must *always* examine the reliability of a show-up under the *Brathwaite* "totality of the circumstances" test, regardless of whether there was good reason for the police to resort to a show-up.

■ The State's position is supported by this Court's decision in *White v. State*, 773 P.2d 211 (Alaska App.1989). In *White*, we described the test as having two distinct parts:

> In evaluating whether a pretrial identification procedure violates a defendant's due process rights, we follow a two-step analysis. We first ask if the identification procedure is unnecessarily suggestive. If the procedure is unnecessarily suggestive, we then ask if the identification is nevertheless reliable based on the totality of the circumstances.

**2.** 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

*White*, 773 P.2d at 214.[3]

The State's position is also endorsed by a leading treatise on criminal procedure: Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed. 1999). This treatise likewise describes the test as having two parts:

> Under the ... due process test [first announced in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)], the required inquiry is two-pronged[.] ... [T]he first question to be asked is whether the initial identification procedure was unnecessarily or impermissibly suggestive. (The burden is on the defendant to prove by a preponderance of the evidence that the identification was unnecessarily suggestive.) This first inquiry can[,] in turn[,] be broken down into two constituent parts: [the first part] concerning the suggestiveness of the identification, and [the second part] concerning whether there was some good reason for the [authorities'] failure to resort to less suggestive procedures....
>
> Assuming suggestive circumstances, the question then is whether they were impermissible or unnecessary. The [Supreme] Court gave a negative answer [to this question] in *Stovall*, [agreeing with] the lower court's ... conclusion that "an immediate ... confrontation [between witness and suspect] was imperative"[.]

*LaFave*, § 7.4(b), Vol. 2, pp. 667–68 (internal citations omitted).

■ Thus, according to *LaFave*, the *Stovall* decision stands for the proposition that a defendant seeking suppression of an out-of-court identification must show *both* that the identification procedure was suggestive *and* that, under the circumstances, it was not necessary for the police to use such a suggestive procedure.

The text of the *Stovall* decision confirms this description of the rule. In *Stovall*, the police conducted a show-up by bringing the suspect to the wounded witness's hospital room. The question, according to the Supreme Court, was "whether [this identification procedure] was so unnecessarily suggestive and conducive to irreparable mistaken identification [as to deny Stovall] due process of law." [4]

The Supreme Court acknowledged that "[t]he practice of showing suspects singly to [witnesses] for the purpose of identification ... has been widely condemned." [5] Nevertheless, the Court stated, the assessment as to whether a particular show-up violated the suspect's right to due process of law "depends on the totality of the circumstances surrounding it".[6]

It is important to note that, in this last-quoted passage, the Supreme Court was not using the phrase "totality of the circumstances" as a reference to the five-factor test that the Court later adopted in *Manson v. Brathwaite*. The *Brathwaite* decision was still ten years in the future. Rather, when the *Stovall* Court referred to the "totality of the circumstances", the Court was speaking of the circumstances that necessitated (or did not necessitate) a show-up rather than a traditional lineup. This is demonstrated by the fact that, immediately after stating that a court must inquire into the "totality of the circumstances surrounding [the show-up]", the Supreme Court declared that this inquiry was satisfied in Stovall's case because "the record ... reveals that the showing of Stovall to [the surviving witness] in an immediate hospital confrontation was imperative." [7]

Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and the jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, and the need for immediate

---

**3.** Citing *Manson v. Brathwaite*, 432 U.S. 98, 108–09, 97 S.Ct. 2243, 2250, 53 L.Ed.2d 140 (1977), and *Viveros v. State*, 606 P.2d 790, 792 & n. 1 (Alaska 1980).

**4.** *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

**5.** *Id.*, 388 U.S. at 302, 87 S.Ct. at 1972.

**6.** *Id.*

**7.** *Id.*

action[,] and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room.

*Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972.[8]

Based on this circumstance alone, and without examining any of the five factors later delineated in *Brathwaite,* the Supreme Court affirmed the legality of the show-up in *Stovall.*[9]

As *LaFave* explains, the Supreme Court's later decision in *Manson v. Brathwaite* was intended to further temper the *Stovall* rule of exclusion. In *Brathwaite,* the lower court found (and the State of Connecticut conceded) that the identification procedure used by the police—a photographic "show-up" which contained photographs of only one person—was both suggestive *and* unnecessary.[10] The question in *Brathwaite* was whether, in such circumstances, courts should apply a rule of automatic (*"per se"*) suppression or whether, instead, the government should be allowed an opportunity to show that, despite the unnecessary suggestiveness of the identification procedure, the totality of the circumstances demonstrated that the witness's identification was sufficiently reliable to meet due process concerns.

The *Brathwaite* Court ultimately rejected a rule of *per se* suppression in favor of the "totality of circumstances" approach.[11] But in *Brathwaite,* the Court used this phrase— "totality of circumstances"—with a different meaning from the meaning given to this phrase in *Stovall.* Instead of using this phrase to refer to the circumstances that did or did not make a show-up necessary, the Court now used this phrase to refer to the factors that might negate or mitigate the presumed suggestiveness of an unnecessary show-up: the witness's opportunity to view the perpetrator during the crime, the wit-

ness's degree of attention, the accuracy of any prior description given by the witness, the witness's level of certainty when making the identification at the show-up, and the length of time between the crime and the show-up.[12]

One noteworthy portion of the *Brathwaite* decision is the Supreme Court's description of the *per se* suppression rule that the Court was rejecting. The Court noted that the proponents of the *per se* rule "[took] the position that evidence of, or derived from, a showup identification should be inadmissible *unless the prosecutor can justify [the government's] failure to use a more reliable identification procedure."* [13] (emphasis added)

This passage from *Brathwaite* again confirms *LaFave's* analysis of the law on this point: an identification procedure is "unnecessarily suggestive" for purposes of *Stovall* and *Brathwaite* if it is *both* suggestive *and* unnecessary under the circumstances. And the question of whether an identification is reliable under the "totality of the circumstances"—as this phrase is used in the *Brathwaite* decision—arises only if the defendant first successfully demonstrates that it was unnecessary for the government to resort to a show-up as opposed to a less suggestive identification procedure.

Anderson argues that the Alaska Supreme Court has adopted a contrary rule. Anderson points in particular to the decision in *Viveros v. State,* 606 P.2d 790 (Alaska 1980).

The issue in *Viveros* was whether the defendant was entitled to suppression of an identification made by a witness from a photographic lineup. Viveros argued that the photo lineup was "totally unnecessary" and

---

**8.** Quoting the Circuit Court of Appeals' decision, *United States ex rel. Stovall v. Denno,* 355· F.2d 731, 735 (2nd Cir.1966) (*en banc*).

**9.** *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972–73.

**10.** "[The government] at the outset acknowledges that the procedure in the instant case was suggestive because only one photograph was used[,] and unnecessary because there was no emergency or exigent circumstance." *Manson v. Brath-*

*waite,* 432 U.S. at 109, 97 S.Ct. at 2250 (internal quotations and original bracketing omitted).

**11.** *Id.,* 432 U.S. at 112–14, 97 S.Ct. at 2252–53.

**12.** *Id.,* 432 U.S. at 114, 97 S.Ct. at 2253 (citing *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382).

**13.** *Id.,* 432 U.S. at 111, 97 S.Ct. at 2251.

"unduly suggestive".[14] Viveros further argued that the Alaska Supreme Court should adopt the *per se* rule of exclusion that the United States Supreme Court had rejected three years earlier in *Manson v. Brathwaite* —*i.e.*, the rule that evidence of an identification should be automatically excluded once the defendant proved that the identification procedure was unnecessarily suggestive, regardless of any other factors indicating that the identification was reliable.[15]

The supreme court concluded that the challenged photo lineup was *not* suggestive.[16] This, by itself, was sufficient reason to affirm the admissibility of the identification evidence. However, in a footnote, the supreme court went on to reject the rule of *per se* exclusion "because it results in the unnecessary exclusion of much reliable evidence".[17] Instead, the supreme court declared that it would follow the rule announced in *Brathwaite*.[18]

It is true that, over the years, both this Court and the supreme court have issued decisions in which the two separate aspects of the test—unnecessary suggestiveness of the identification procedure, and circumstances indicating the reliability of the identification notwithstanding the unnecessary suggestiveness of the procedure—are spoken in the same judicial breath, as if they were one composite test.

For example, in *Holden v. State*, 602 P.2d 452 (Alaska 1979), the supreme court expressed its disapproval of single-suspect photo lineups, but then the court added that the question of "whether such [identification procedures] violate due process depends on the totality of the surrounding circumstances. *Stovall v. Denno* . . . ."[19]

The key to understanding this passage from *Holden* is to note that our supreme court declared that *Stovall v. Denno* was the source of the "totality of circumstances" test. As we explained earlier in this opinion, the

*Stovall* opinion did not use the phrase "totality of the circumstances" as a reference to the five-factor test for reliability that the United States Supreme Court adopted ten years later in *Manson v. Brathwaite*. Rather, when the *Stovall* Court spoke of the "totality of the circumstances", the Court was talking about the circumstances that necessitated, or did not necessitate, an inherently suggestive identification procedure (*e.g.*, a show-up as opposed to a traditional lineup).

Despite the arguably ambiguous wording of cases like *Holden*, our supreme court has never expressly rejected federal law on this subject (the law declared in *Stovall* and *Brathwaite* ) in favor of a different rule adopted under our state constitution. Rather, the test in Alaska is the same one announced by the United States Supreme Court: when (and only when) the "totality of the circumstances" (in the *Stovall* sense) demonstrates that an identification procedure was unnecessarily suggestive, a court must then examine whether the "totality of the circumstances" (in the *Brathwaite* sense) demonstrates that the identification was in fact reliable, notwithstanding the suggestiveness of the procedure.

 For these reasons, we conclude that the position espoused by the State in this appeal is the correct one. When a defendant challenges the admissibility of an identification made during a show-up, the court must first determine whether, under the circumstances, it was necessary for the police to resort to this type of suggestive identification procedure. If the court determines that a show-up was necessary under the circumstances, the inquiry ends. If, on the other hand, the court determines that the show-up was unnecessary, or that it was done in an unnecessarily suggestive way, then the court must assess the reliability of the witness's identification under the five-factor "totality of the circumstances" test announced in *Brathwaite*.

14. *Viveros,* 606 P.2d at 791–92.

15. *Id.*

16. *Id.* at 792.

17. *Id.* at 792 n. 1.

18. *Id.*

19. *Holden,* 602 P.2d at 456.

In Anderson's case, a violent crime had been committed some thirty minutes before, and the suspect was at large. By bringing N.B. to the scene of the traffic stop, the police could either (1) positively identify Anderson as the man they were looking for, or (2) eliminate Anderson as a suspect, so that the officers could resume their investigative efforts and their search of the city for a similar brown sedan.

Superior Court Judge Larry D. Card found that, under these facts, a show-up was necessary. In his ruling, Judge Card declared that "the need for quick police outwork outweigh[ed] the inherent suggest[iveness] of ... the one-person lineup." Anderson does not contend that a show-up was unnecessary, and, in any event, Judge Card's finding is amply supported by the record.

As courts have frequently noted, show-ups are inherently suggestive. This was true in Anderson's case. When Anderson was displayed to N.B., he was clearly in custody: he was standing near patrol cars, he was in handcuffs, and he was flanked by two uniformed police officers. Moreover, N.B. knew that she had been brought to the scene to see if she could identify Anderson as the man who broke into the house and assaulted her and her boyfriend.

However, these factors typify a show-up. And in cases where a show-up is necessary, these factors do not, by themselves, make that show-up a violation of the suspect's rights under the due process clause. *See People v. Armstrong*, 11 A.D.3d 721, 783 N.Y.S.2d 134, 136 (2004); *State v. Norrid*, 611 N.W.2d 866, 871–72 (N.D.2000); *State v. Sparks*, 39 Conn.App. 502, 664 A.2d 1185, 1188–89 (1995); *People v. Hughes*, 259 Ill. App.3d 172, 198 Ill.Dec. 192, 632 N.E.2d 251, 254–55 (1994).

█ The show-up in Anderson's case was no more suggestive than a typical show-up. We further note that, even though Anderson and Engstrom were displayed to N.B. in virtually identical ways, N.B. positively identified Anderson but told the police that she could not identify Engstrom. This fact supports the judicial consensus that a typical show-up is not so suggestive as to violate the

guarantee of due process of law—not so suggestive that we should conclude, as a matter of law, that a resulting identification is the product of suggestion rather than memory.

For these reasons, we uphold Judge Card's ruling that evidence of N.B.'s identification of Anderson at the show-up was admissible at Anderson's trial.

*Did Anderson's act of tossing the handgun and the ammunition from the car constitute the crime of tampering with evidence?*

As we explained earlier in this opinion, while the police were chasing the car in which Anderson was riding, Anderson tossed various articles from the car: a handgun, the magazine for this handgun, and matching .45 caliber ammunition. Ballistics testing revealed that this handgun was the weapon used in the shooting. Based on these facts, the State charged Anderson with the offense of tampering with evidence, AS 11.56.610(a)(1).

The pertinent portion of the evidence tampering statute declares that it is unlawful to "alter", "suppress", "conceal", or "remove" physical evidence "with intent to impair its verity or availability". Anderson argues that the facts of his case, even when viewed in the light most favorable to the State, are legally insufficient to prove that he committed the *actus reus* of this crime.

Anderson relies on our decision in *Vigue v. State*, 987 P.2d 204 (Alaska App.1999), where we held that a defendant's act of tossing several rocks of cocaine to the ground as a police officer approached him did not constitute an act of suppression or concealment, but rather an act of abandonment. *Id.* at 210. Anderson asserts that his act of tossing the handgun, the magazine, and the ammunition from the car should likewise be categorized as an abandonment of this evidence, and not an act of evidence tampering.

The State offers various rationales for concluding that Anderson's conduct constituted the offense of evidence tampering. The State's primary argument is that Anderson's actions constituted a "removal" of the evidence under the definition that we gave to

that term in *Vigue:* "the act of moving an object from the scene of the crime, or from any location where its evidentiary value can be deduced, to some other place where its evidentiary significance may not be detected". *Vigue,* 987 P.2d at 210.

In the alternative, the State argues that Anderson's conduct constituted a "suppression" or a "concealment" of the evidence. Finally, the State contends that Anderson, by removing the magazine from the handgun, "altered" the handgun.

As we noted in *Vigue,* courts from around the country have struggled with evidence tampering statutes like ours. One particular problem is that, if we give a broad interpretation to the words "suppress", "conceal", "remove", and "alter", the statute "lead[s] to results that are inexplicably harsh and probably not within the legislature's intent".[20]

For instance, if we were to give a broad interpretation to the words "remove", "conceal", and "alter", then a person who shoplifted a candy bar would commit three separate acts of evidence tampering—three separate felonies—when they (1) walked away from the store with the candy, (2) unwrapped the candy and deposited the wrapper in a trash receptacle, and then (3) ate the candy. It seems implausible that the legislature intended the statute to be applied in this manner.

Accordingly, we conclude that we must refine the definition of "remove" that we offered in *Vigue.* We acknowledge that the State's argument in this appeal is based on a plausible application of what we said in *Vigue,* but the facts of Anderson's case demonstrate that we must define "remove" even more narrowly. Under the State's interpretation of "remove", the crime of evidence tampering would occur whenever a person committed a theft and then left the scene of the crime with the stolen property, or whenever a person committed an assault with a weapon and then left the scene with the weapon still in their possession.

 We believe that this expansive application of the evidence tampering statute is inconsistent with the legislature's intent. We therefore reject the State's argument that

Anderson committed a "removal" of evidence when he drove away from the scene of his crimes with the handgun and ammunition still in his possession.

 One might still argue that Anderson's act of tossing these articles out of the car constituted a "removal" of these articles from a place where their evidentiary value could be deduced (*i.e.,* inside the car) to a place where their evidentiary value might be missed (*i.e.,* on the street). We do not say that tossing evidence from a car could never constitute the offense of evidence tampering. But for purposes of evidence tampering charged under a "removal" theory, the crucial inquiry is whether the defendant's action disguised the evidentiary value of the article. Under the facts presented here, Anderson's act of tossing the handgun, magazine, and ammunition out of the car in the sight of the police did nothing to disguise the evidentiary value of these items. We therefore reject the State's contention that Anderson's conduct constituted the offense of evidence tampering by "removal".

 For essentially the same reason, we reject the State's contention that Anderson's removal of the magazine from the handgun constituted an act of "alteration" for purposes of the evidence tampering statute. To constitute an "alteration", the defendant's conduct must disguise or alter the evidentiary value of the article. That did not happen here.

 This leaves the State's argument that Anderson committed acts of "suppression" or "concealment" when he tossed the gun, the magazine, and the ammunition from the car while the police pursued him through Fairview.

As we noted in *Vigue,* courts from other jurisdictions with evidence tampering statutes like ours generally rule that a defendant does not commit the crime of evidence tampering merely by tossing away drugs or other contraband while being approached or chased by the police. See the cases discussed in *Vigue,* 987 P.2d at 206–209. See also these more recent decisions: *In re Juve-*

20. *Vigue,* 987 P.2d at 211.

*nile 2003–187,* 151 N.H. 14, 846 A.2d 1207, 1209–1211 (2004); *State v. Mendez,* 175 N.J. 201, 814 A.2d 1043, 1048–1051 (2002); *In re M.F.,* 315 Ill.App.3d 641, 248 Ill.Dec. 463, 734 N.E.2d 171, 175–79 (2000).

There are some contrary decisions. See *State v. Harley,* 982 P.2d 1145, 1146, 1147–48 (Utah App. 1999), where the court held that the defendant's act of tossing a weapon from a car while being chased by the police constituted the offense of evidence tampering; and *State v. Foreshaw,* 214 Conn. 540, 572 A.2d 1006, 1012 (1990), where the court held that the evidence was sufficient to support a conviction for evidence tampering where the defendant tossed a weapon from her car as she drove away from the scene of the homicide, even before the police knew of the crime. However, neither the Utah court nor the Connecticut court gave any explanation for their decision; it is unclear whether these courts considered any of the issues that we discussed in *Vigue* and that we are discussing here.

■ This is not to say that the act of tossing away evidence can never constitute evidence tampering. The test appears to be whether the defendant disposed of the evidence in a manner that destroyed it or that made its recovery substantially more difficult or impossible. Thus, in *State v. Mendez* (cited two paragraphs above), the New Jersey Supreme Court ruled that the defendant was properly convicted of evidence tampering when the defendant held a bag of powder cocaine outside the window of his car and allowed the wind to disperse the powder. Even though the defendant performed this action in the sight of the pursuing police, the defendant's conduct essentially precluded all efforts to recover the evidence—and, for this reason, the court held that the defendant's conduct was materially different from the typical act of tossing aside evidence during a police chase. *Mendez,* 814 A.2d at 1044–45, 1050–51.

See also *People v. Brake,* 336 Ill.App.3d 464, 270 Ill.Dec. 784, 783 N.E.2d 1084,1086–87 (2003), where the court held that a defen-

dant's act of swallowing contraband to prevent its seizure by the police constituted the offense of evidence tampering.

The State acknowledges the line of authority holding that an evidence tampering conviction is not proper when the government proves only that the defendant tossed away evidence while being approached or chased by the police. But the State urges us to confine this reasoning to ongoing possessory offenses such as illegal possession of drugs, alcohol, or tobacco, and to apply a different rule in situations involving completed crimes like the burglary and assaults at issue in Anderson's case.

It is true that most of the court decisions addressing the problems caused by an overbroad definition of evidence tampering arise from prosecutions for possessory offenses. But as we pointed out in our example involving the shoplifting of a candy bar, these problems are not confined to possessory offenses. We do not believe that the legislature intended to impose felony penalties on a shoplifter who takes a candy bar (a class B misdemeanor) [21] and then throws the candy away when police officers or store employees approach or give chase.

In Anderson's case, as was true in *Vigue,* the defendant may have intended to make it harder for the police to detect or recover the articles of physical evidence. But, as in *Vigue,* "no suppression or concealment occurred: [the police] observed [the defendant's] action and [were] alerted to the possibility that something might be on the ground" along the sedan's route of travel.[22]

For these reasons, we conclude that Anderson's conviction for evidence tampering must be reversed.

### Anderson's sentence appeal

Anderson was convicted of first-degree robbery (a class A felony), first-degree assault (another class A felony), first-degree burglary (a class B felony), and third-degree assault (a class C felony), as well as evidence tampering (a class C felony conviction that

---

**21.** *See* AS 11.46.150 (fourth-degree theft) and AS 11.46.220(a) and (c)(3) (concealment of merchandise valued at less than $50).

**22.** *Vigue,* 987 P.2d at 210.

we have just reversed) and third-degree weapons misconduct (felon in possession of a concealable firearm, a class C felony).[23]

Anderson was a third felony offender (*i.e.*, he had two prior felony convictions). Because of this, he faced a presumptive term of 15 years' imprisonment for his two class A felonies (the robbery and the first-degree assault), a presumptive term of 6 years' imprisonment for his class B felony (the burglary), and a presumptive term of 3 years' imprisonment for his two class C felonies (the third-degree assault and the weapons misconduct).[24]

The information contained in the pre-sentence report shows that Anderson has been engaged in criminal activity more or less continuously since 1992 (shortly after he turned eighteen). In the nine years between 1992 and his current offenses, there has scarcely been a six-month period (except for times when Anderson was in custody) when Anderson did not violate the law or the terms of his release or probation.

 Based on Anderson's lengthy criminal history and the facts of his present offenses, Judge Card found that Anderson was "a particularly dangerous offender" who was both undeterrable and incapable of rehabilitation. Echoing the Alaska Supreme Court's language in *State v. Hodari* (a case we discuss below), Judge Card declared that Anderson's criminal behavior was "compulsive" or "ingrained". Based on these findings, Judge Card concluded that, in order to adequately protect the public, he would have to impose a composite sentence that was greater than the 20–year maximum sentence for any single one of Anderson's offenses.[25]

For Anderson's robbery and the first-degree assault convictions, Judge Card increased the 15–year presumptive term by adding an additional 5 suspended years of imprisonment; that is, Judge Card imposed a sentence of 20 years with 5 suspended on each of these two counts. The judge imposed these two sentences consecutively. That is, Anderson's composite sentence for these two offenses was 30 years to serve.

For the third-degree assault, Judge Card imposed a sentence of 5 years with 2 years suspended—*i.e.*, 3 years to serve. Judge Card imposed these 3 years consecutively to Anderson's sentences for the robbery and the first-degree assault—thus increasing Anderson's composite sentence to 33 years to serve.

Anderson received concurrent sentences for the burglary conviction, the weapons misconduct conviction, and the now-reversed evidence tampering conviction. Because of this, and because evidence tampering was one of Anderson's class C felony convictions (*i.e.*, the least serious crimes for which he was being sentenced), we conclude that the reversal of this conviction does not affect our consideration and resolution of Anderson's claim that his composite sentence is excessive.

In this appeal, Anderson claims that his composite sentence of 33 years to serve is excessive as a matter of law under this Court's decision in *DeGross v. State*, 816 P.2d 212 (Alaska App.1991). In *DeGross*, we stated that defendants who commit violent crimes—even a series of violent crimes during one criminal episode—should normally receive no more than 20 years to serve.[26] Even in the uncommonly aggravated circumstances of DeGross's case—two armed robberies, culminating in a gun battle with the police in which DeGross's accomplice was

---

**23.** *See* AS 11.41.500 (first-degree robbery), AS 11.41.200 (first-degree assault), AS 11.46.300 (first-degree burglary), AS 11.41.220 (third-degree assault), and AS 11.61.200 (third-degree weapons misconduct).

**24.** *See* AS 12.55.125(c)(4), AS 12.55.125(d)(2), and AS 12.55.125(e)(2), respectively. (All references are to the versions of these statutes as they existed prior to March 2005, when the legislature amended the presumptive sentencing laws.)

**25.** Under the Alaska Supreme Court's sentencing decisions, a judge must not impose a composite sentence that exceeds the maximum sentence for the defendant's single most serious offense unless the judge finds that such a sentence is required to protect the public. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981); *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977).

**26.** *DeGross*, 816 P.2d at 219–220.

killed—we approved a composite sentence of only 30 years.[27]

But as the State notes, the defendant in *DeGross* was a first felony offender.[28] Anderson, in contrast, is a third felony offender who faced a presumptive 15 years' imprisonment on each of his two class A felonies—in essence, a 15–year minimum sentence, since Anderson failed to prove any mitigating factors.

Moreover, we now acknowledge that what we said in *DeGross* about the limitations on sentences for violent crimes can no longer be taken as authoritative, given the Alaska Supreme Court's decisions in *State v. Wentz*, 805 P.2d 962, 965 (Alaska 1991), and *State v. Hodari*, 996 P.2d 1230, 1235–37 (Alaska 2000). In *Hodari*, the supreme court reversed this Court and reinstated a 55–year composite sentence imposed on "an ingrained and compulsive [second felony] offender" who committed a series of violent offenses during a single criminal episode.[29]

We therefore reject Anderson's argument that his sentence exceeds the range of sentences permitted by *DeGross*.

▮ Anderson also argues that Judge Card committed error by finding aggravating factors based on the same conduct for which Anderson had been separately convicted and for which Anderson was being separately punished. Anderson is correct.

In *Juneby v. State*, 641 P.2d 823, 842 (Alaska App.1982), we held that a sentencing court should not find an aggravating factor based on conduct for which the defendant is being separately sentenced. The record shows that this rule was violated repeatedly at Anderson's sentencing.

It is true that Judge Card found other aggravating factors that Anderson does not

challenge. Thus, even without the disputed aggravating factors, Judge Card was legally authorized to impose sentences above the applicable presumptive terms.

However, we do not know whether Judge Card would have exercised his sentencing discretion in the same way if he had realized that the *Juneby* rule prohibited him from relying on the disputed aggravators. For this reason, we direct Judge Card to reconsider Anderson's sentence.

*Conclusion*

Anderson's conviction for tampering with evidence is REVERSED. His other convictions are AFFIRMED. However, the superior court is directed to reconsider Anderson's sentence, as explained in the preceding section of this opinion.

The superior court shall re-sentence Anderson within the next 60 days. Within 30 days after that, Anderson shall notify this Court whether he still wishes to contest his composite sentence—either by filing a memorandum that addresses the sentencing issues, or by filing a notice that he does not intend to pursue his appeal further.

If Anderson declares that he will not pursue this appeal further, we will close this file. If, on the other hand, Anderson files a sentencing memorandum, the State shall have 30 days to file a responsive memorandum. After we have received the parties' memoranda, we will decide Anderson's sentence appeal.

---

**27.** *Id.* at 220.

**28.** *Id.* at 215.

**29.** *Hodari*, 996 P.2d at 1237.