**Nicholas STEPOVICH, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10668.

Court of Appeals of Alaska.

April 26, 2013.

Marcia E. Holland, Missoula, Montana, under contract with the Stepovich and Vacura Law Office, Fairbanks, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

Nicholas Stepovich appeals his convictions for fourth-degree controlled substance misconduct (possession of cocaine) and attempted evidence tampering.[1] He contends that the evidence against him was the unlawful fruit of an investigative stop that was not supported by reasonable suspicion of identifiable criminal activity. Stepovich also argues that his trial was flawed by two mistaken evidentiary rulings. Finally, Stepovich argues that the evidence presented at his trial is insufficient to support his conviction for attempted evidence tampering.

For the reasons explained in this opinion, we conclude that the investigative stop was proper. With respect to the two challenged evidentiary rulings, we conclude that one ruling was proper and the other was harmless. Finally, we agree with Stepovich that the State's case was insufficient to support his conviction for attempted evidence tampering.

*Underlying facts*

Fairbanks Police Officer Kurt Lockwood was on patrol in downtown Fairbanks in the early morning hours of November 8, 2008. He decided to check the parking lot located behind the Big I Bar because there had been problems with homeless people and transients sleeping near the residences in that area.

As Lockwood was driving past the back entrance to the Big I, he saw two men standing near a Dumpster. The men were facing each other and standing very close together—perhaps 18 inches apart. Their heads were bent forward, toward each other. The men's hands were cupped, at approximately chest level, and their hands were either touching or nearly touching. The men were staring intently downward, toward their hands.

As soon as Lockwood spotted the men, he hit the brakes of his patrol car. Both men looked up, and Lockwood observed that they had expressions of "sheer panic", as if they had been "caught in a cookie jar". The men immediately separated from each other, and they put their hands in their pockets.

One of these men (the man who was initially facing in Lockwood's direction) was Nicholas Stepovich.

As the men separated, Lockwood got out of his patrol car and directed both men to stop. When they continued walking, he repeated this directive several times, using words to the effect of, "Fairbanks police: Stop; hold it right there.... Don't go in the bar. Stop right there; hold on."

Stepovich's companion eventually stopped walking, but Stepovich did not. Stepovich kept walking away from Lockwood, toward the Dumpster, and then he circled around the Dumpster to the other side (*i.e.*, out of Lockwood's sight). He had his hands in the front pockets of his jacket.

As Stepovich rounded the Dumpster, Lockwood saw him pull his hands out of his

---

**1.** AS 11.71.040(a)(3)(A) and AS 11.56.610(a)(1), respectively.

jacket and extended them in front of him. A few moments later, when Stepovich emerged from behind the Dumpster (and into Lockwood's sight again), he was holding his hands in plain view.

Stepovich now appeared relaxed, and he spoke to Lockwood, saying, "What's the big deal? I was just urinating," or "I was just taking a leak."

Lockwood summoned a backup officer, and after this officer arrived, Lockwood went around to the other side of the Dumpster, where Stepovich had been. There, Lockwood found a paper slip of cocaine lying on top of the fresh snow. Based on this discovery, Stepovich was arrested.

Incident to this arrest, Lockwood searched Stepovich's pockets. He discovered and seized $865 in cash and a small plastic jar full of gold nuggets. The gold nuggets weighed slightly more than 307 grams (*i.e.*, a little less than 11 ounces); this amount of gold was worth between $8,000 and $9,000.

After Stepovich was transported to the Fairbanks police station, Lockwood had a drug-detection dog sniff the cash and the gold nuggets that had been seized from Stepovich. This dog, who was named Argo, was trained to detect the odor of four controlled substances: cocaine, marijuana, methamphetamine, and heroin. Argo alerted when he smelled the cash and the nuggets; that is, he apparently detected the odor of at least one of these four controlled substances.

Stepovich was ultimately charged with possession of cocaine and attempted tampering with evidence (for dropping the slip of cocaine to the ground behind the Dumpster).

*The State's rationale for the investigative stop, and the superior court's ruling*

After Stepovich was indicted, he filed a motion asking the superior court to suppress all evidence stemming from his encounter with Officer Lockwood after the officer directed him to stop.

■ The superior court ruled that when Officer Lockwood directed Stepovich not to walk away, but to stay so that the officer could make contact with him, Lockwood subjected Stepovich to an investigative stop. The State does not challenge this portion of the superior court's ruling. Instead, the State argues that this investigative stop was justified by a reasonable suspicion of criminal activity, under the test formulated by this Court in *State v. G.B.*, 769 P.2d 452, 456 (Alaska App.1989).

At the evidentiary hearing in the superior court, Officer Lockwood offered this explanation of why he made the investigative stop:

*Lockwood:* Based on my training and experience, when I pulled up [and] saw these [two] individuals standing as close as they were together, ... both [of them with] their hands ... cupped[, and] very intently looking down at something[, and] given ... the hour of the day, [and] the location, ... it was [immediately apparent] to me that these men [were] involved in either a narcotics use [or a narcotics] transaction of some sort.

. . .

I've spent the majority of my ten years [in law enforcement] working [the] midnight shift. The bar scene is not something new to me. I contact people quite often out behind their cars, [because the] restrooms are full, [or] for whatever reason, urinating, whatever. . . . Buddies don't stand face-to-face urinating. They don't stand face-to-face with their hands in that position smoking a cigarette.

And I've seen all of the above hundreds of times, you know, two guys out sharing a cigarette in the fresh air, two guys urinating next to each other behind a car, or out of sight somewhere like that. . . . [But this case was different because of] where [the two men] were at, [and because] they looked up [in] sheer panic—guilty [conscience], if you will.

Because ... guys that are urinating behind their cars [at] the bars, oftentimes, you know, they see [an officer] and ... they'll wave, ... or they kind of scurry behind their car—but their hands are different, their actions are different. You know, they're not really trying to hide anything; they're not—they don't have that look of, "Gee, I'm busted." It's more

[a look of] slight[ ] embarrassment at the time.

Guys smoking a cigarette will wave at you; guys just out talking to their buddy will wave at you.... It was ... the combination of events, of where they were placed, how they were placed, where their hands were, and .[their] immediate first reaction of ... sheer panic: "Oh my gosh, there's ... the cops, and now we have to scurry."

Superior Court Judge Mark I. Wood adopted this reasoning when he ruled that, given the circumstances, Officer Lockwood acted properly:

*The Court*: [It was] about one o'clock in the morning [on a Saturday], ... behind the Big I Bar. This ... officer ... [was] driving behind the Big I Bar, [and] he [saw] two individuals who [were] located ... behind the Dumpster that's behind the Big I Bar. Now, they [were] visible [from] the alley, but they [were] ... not really visible [from] the Big I.

And when [the officer saw] them, ... they [were] not ... standing by a car. Instead, they [were] behind a Dumpster at this hour. And ... their heads [were] bowed, looking down, looking at their hands. [Their hands were] up by their chest, their hands [were] touching, and ... [in] almost a cupped position.

Now, ... our law enforcement officers [can properly take steps to] find out what's going on in that type of a situation. And ... Officer Lockwood testified that he ... wanted to ask them questions. [But] when he stopped [his patrol car] and started to get out of the car, and they looked up [and] saw a police car ...—well, there was a panic[ked] expression, there was sudden activity, there was movement, there was undirected movement of their feet; I think the word was "scurrying".... [From the testimony], it sounded like they were going back and forth, not knowing which way to go, and then they place[d] their hands in [their] pockets and walk[ed] quickly back to the Big I.

[The two men] weren't smoking anything; they weren't urinating; [it] didn't look like there was any conversation going on. Whatever they were doing involved this examination of whatever was in their hands. A reasonable officer with Officer Lockwood's training could assume that there was illegal activity afoot, [and] particularly, ... drug activity—given the location, the time, and the nature of the conduct, and [the men's] reaction when they realized that a police officer was watching them do it. That fits all of the grounds that *Newsom* talks about.

...

[The officer's suspicion was] more than a hunch because of the [men's] reaction, [and] because of their location, and the time of night.... [And] this was a minimally intrusive stop. He asked them to stop, [but] he didn't chase them. He went ... in the direction where Mr. Stepovich was heading, and ... Mr. Stepovich went [behind] the Dumpster, and then he went around the Dumpster and[, within] moments[, he] came back out with a completely different [demeanor].

...

So I'm not going to suppress the evidence from the stop[.] I'm going to deny the motion to suppress.... [The officer] had a right to ask them to stop.

*Why we conclude that the investigative stop was proper*

The encounter between Stepovich and Officer Lockwood essentially has two parts. The first part consisted of Lockwood's observation of Stepovich and the second man standing close together, face-to-face, beside the dumpster, with their hands cupped in front of them.

Given the location (the parking lot behind a bar) and the time of day (one o'clock in the morning), we agree with Judge Wood that the circumstances were unusual, and that it was reasonable for Officer Lockwood to "[take steps to] find out what [was] going on" by stopping his patrol car and asking questions.

The issue in this case arises from the fact that Lockwood did not merely ask questions; rather, he exerted his authority as a law enforcement officer, commanding Stepovich

and his companion to remain where they were while he investigated what was going on. Thus, the encounter became a "seizure" for Fourth Amendment purposes.[2]

Lockwood's investigative stop of Stepovich would be justified only if the officer had a "reasonable suspicion" that "imminent public danger exist[ed] or [that] serious harm to persons or property [had] recently occurred." *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). *See also State v. G.B.*, 769 P.2d 452, 455–56 (Alaska App.1989) (interpreting the *Coleman* test).

This Court has held that the illicit sale of drugs qualifies as an "imminent public danger" for purposes of the *Coleman* test,[3] so the question here is whether the facts known to Lockwood supported a reasonable inference that he had just interrupted a drug transaction.

We have already quoted Lockwood's description of what he saw—the location (an empty alley behind a bar), the time of day (one o'clock in the morning on a Saturday), and Lockwood's explanation of why he concluded that he was probably witnessing a drug transaction rather than witnessing two men sharing a cigarette, or two men who had gone outside to urinate.

Lockwood's suspicion was heightened by the reaction of the two men when he stopped his patrol car in their vicinity. As Lockwood described in his testimony, Stepovich and his companion reacted with "sheer panic"; both men had facial expressions as if they had been "caught in a cookie jar". Stepovich and his companion immediately broke away from each other, and they put their hands in their pockets.

We conclude that these circumstances, taken together, gave rise to the articulable suspicion required by *Coleman*—a reasonable suspicion that Lockwood had just interrupted a drug sale. Accordingly, we affirm the superior court's denial of Stepovich's motion to suppress the cocaine.

*The admissibility of the evidence that the drug-detection dog alerted to the cash and the jar of gold nuggets found in Stepovich's pockets*

The major evidentiary problem facing the State was to prove that Stepovich was the person who dropped the slip of cocaine that Officer Lockwood found on the ground behind the bar. As Stepovich's attorney emphasized during his cross-examination of Lockwood, Lockwood did not see Stepovich throw or drop the slip to the ground. Moreover, Lockwood never saw cocaine (or any other controlled substance) in Stepovich's hands, nor did Lockwood find any cocaine-related paraphernalia in Stepovich's possession following his arrest.

■ To bolster its circumstantial case that the slip of cocaine belonged to Stepovich, the State introduced evidence (over Stepovich's objection) that Argo, the drug-detection dog, alerted to the cash and the jar of gold nuggets seized from Stepovich's pockets following his arrest.

This information was introduced through the testimony of Officer Lockwood and the testimony of Argo's handler, Trooper Brian Zeisel.

Lockwood testified that, following Stepovich's arrest, he searched Stepovich's pockets and found the cash and the jar full of gold. Lockwood explained that the jar of gold was discovered in one of the jacket pockets where Stepovich had thrust his hands when the officer approached.

Lockwood theorized that the jar of gold or the cash, or both, might have the odor of cocaine if they had been in the vicinity of cocaine long enough, so Lockwood decided to summon a drug-detection dog to smell these items. Lockwood hid the items out of sight in two different rooms of the police station— the cash in one of the mailboxes in the police mail room, and the jar of gold nuggets (with the lid of the jar removed) in a box in the police briefing room. Lockwood then called

---

**2.** *See Majaev v. State*, 223 P.3d 629, 632 (Alaska 2010): "A seizure [occurs] when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."

**3.** *Skjervem v. State*, 215 P.3d 1101, 1106 (Alaska App.2009); *LeMense v. State*, 754 P.2d 268, 272–73 (Alaska App.1988).

Zeisel and asked him to bring his dog, Argo, to the police station to see if the dog found anything.

Argo alerted to the cash in the mail room and to the jar of gold nuggets in the briefing room.

During Zeisel's testimony, he explained that Argo was trained to detect four different controlled substances: marijuana, cocaine, heroin, and methamphetamine. The fact that Argo alerted to the cash and to the jar of gold nuggets meant that both of these items gave off one of the four smells that Argo had been trained to detect.

(With respect to the jar of gold nuggets, Zeisel conceded that he did not know whether Argo alerted to the nuggets or to the jar itself.)

In the superior court, Stepovich's attorneys argued that the evidence pertaining to the dog sniff was not admissible unless and until the State established a valid scientific basis for this evidence under the *Daubert* test.[4] However, the defense attorneys did not attack the validity of the scientific premises of this evidence—for example, the premise that a dog can detect odors that are undetectable by humans, or the premise that a dog can be trained to react in a particular, identifiable fashion to one or more specific odors.

Instead, Stepovich's attack on the dog-sniff evidence focused on the arguable ways in which the evidence might not be probative of the factual assertion for which it was offered—to wit, the State's assertion that the cash and the jar of gold nuggets found in Stepovich's pockets had recently been in contact with, or in the close vicinity of, cocaine.

Stepovich's lawyers pointed out that the dog, Argo, had been trained to react in the same way to four different controlled substances (marijuana, cocaine, heroin, and methamphetamine), so the fact that Argo alerted to the cash and the jar of gold did not necessarily prove that these items smelled of

cocaine, as opposed to one of the other three controlled substances.

Stepovich's lawyers also presented the testimony of a dog handler expert witness, Lieutenant Garry Gilliam of the Anchorage Police Department.

With respect to the fact that Argo alerted to the cash found on Stepovich, Gilliam testified that this fact had little probative value, because a large percentage of United States currency is contaminated with trace amounts of illegal drugs—in particular, cocaine.

Gilliam also testified that one of the major chemical ingredients of cocaine, methyl benzoate, dissipates over time. Thus, even if the cash and the jar of nuggets found in Stepovich's possession had been in contact with cocaine, the methyl benzoate might have dissipated by the time the police conducted the dog sniff. This would suggest that Argo might have been reacting to some substance other than cocaine.

After hearing this evidence (and the arguments of Stepovich's attorneys), Judge Wood concluded that Stepovich's attack on the dog-sniff evidence did not really raise an issue of scientific validity under *Daubert*. Rather, the judge concluded, Stepovich had offered potential reasons for doubting the probative value of the evidence.

Judge Wood acknowledged that if Argo had reacted solely to the cash, this "alert" might have little probative value. But the judge pointed out that Argo reacted to both the cash and the jar of gold nuggets.

Judge Wood further acknowledged that Stepovich's attorneys had raised other "legitimate concerns" about the probative force of this evidence. But the judge declared that the ultimate question was "whether those concerns [are so paramount] that I [sh]ouldn't submit [the issue] to the jury to [let them] figure it out."

Judge Wood concluded that Stepovich's concerns about the probative value of the dog-sniff evidence "[went] to weight, not admissibility", so the judge allowed the State to

**4.** *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (announcing a new test for assessing the admissibility of scientific evidence);

*State v. Coon,* 974 P.2d 386, 395–98 (Alaska 1999) (adopting the *Daubert* test under the Alaska Rules of Evidence).

introduce this evidence. However, the judge declared that he would instruct the jury that the dog-sniff evidence "should be treated with caution", because it was important for the jury to understand "that they need to scrutinize [this] evidence". Judge Wood invited Stepovich's attorneys to submit such an instruction.

On appeal, Stepovich renews the arguments that he made in the superior court. But the record shows that Judge Wood understood the potential problems with this evidence, and the judge concluded that these problems affected the weight, rather than the admissibility, of the evidence.

The question is whether Judge Wood's resolution of this issue constitutes an abuse of discretion—*i.e.*, whether his decision was "clearly untenable or unreasonable". *Gonzales v. State*, 691 P.2d 285, 286 (Alaska App.1984). Our review of the record convinces us that Judge Wood did not abuse his discretion when he decided to admit this evidence, but to instruct the jurors to view the evidence with caution.

*The admissibility of the evidence concerning the value of the cash and the gold nuggets found on Stepovich's person when he was arrested*

As we have explained, Stepovich was found to be carrying $865 in cash and several thousand dollars' worth of gold nuggets when he was arrested. Before trial, Stepovich asked the superior court to prohibit the State from introducing evidence concerning the value of the cash and the gold. Stepovich's attorney argued that the value of the cash and the gold was irrelevant, and that admission of this evidence would simply encourage the jury to speculate that Stepovich was engaged in "some nefarious activity" apart from his alleged possession of the cocaine.

(The defense attorney was apparently referring to the possibility that the jurors might conclude that Stepovich was either selling drugs or was planning to purchase a much greater quantity of drugs in the near future.)

The prosecutor conceded that Stepovich's possession of such a large amount of cash and gold gave rise to a reasonable inference that Stepovich was "engaged in trafficking"—either buying or selling large amounts of drugs. But the prosecutor argued that, even though the State had only charged Stepovich with simple possession of cocaine (and not possession for purposes of distribution), the State was nevertheless entitled to introduce evidence of how much cash and gold Stepovich was carrying—because if Stepovich *was* engaged in buying or selling cocaine in commercial quantities, this would be relevant to prove that he possessed the slip of cocaine at issue in this case.

Judge Wood declared that he would not "sanitize the facts [for] the jury", and so he allowed the State to introduce evidence of the value of the cash and the gold that Stepovich was carrying. However, the judge expressly prohibited the prosecutor from using this evidence to argue that Stepovich was engaged in the distribution of cocaine.

Judge Wood's ruling appears to be a reasonable effort to balance the probative value of the evidence against its potential for unfair prejudice, and to minimize that potential unfair prejudice.

But even assuming that this ruling was an abuse of discretion, any error was harmless under the facts of Stepovich's case. Stepovich's wife testified at trial that Stepovich was a restaurant owner, and that he regularly carried large amounts of cash on his person during the days leading up to his weekly deposit of funds into the bank. With respect to the jar of gold nuggets, Stepovich's wife explained that Stepovich had purchased the nuggets at her request, because she intended to use the nuggets to make jewelry for friends and family.

When Stepovich designated the transcript in this case, he did not designate the summations of the parties to the jury at the end of the trial. However, we must assume that the prosecutor obeyed Judge Wood's directive, and that the prosecutor refrained from arguing that Stepovich's possession of the cash and the gold nuggets indicated that he was engaged in the distribution of drugs.

Given this record, we conclude that the evidence concerning the value of the cash

and the gold nuggets did not appreciably affect the jury's verdict.[5]

*Why we conclude that the evidence presented at Stepovich's trial is not legally sufficient to support Stepovich's conviction for attempted tampering with evidence*

Under AS 11.56.610(a)(1), a person commits the offense of tampering with physical evidence if the person "suppresses or conceals" physical evidence with the intent to impair its availability in an official proceeding or a criminal investigation.

 Based on evidence that Stepovich stepped behind a Dumpster when Officer Lockwood approached, and that Stepovich dropped or threw the slip of cocaine to the ground behind the Dumpster, the State charged Stepovich with attempted evidence tampering—that is, an attempt to suppress or conceal the cocaine.

We addressed an analogous situation in *Vigue v. State*, 987 P.2d 204 (Alaska App. 1999). In *Vigue*, a police officer contacted the defendant for urinating in public.[6] Vigue walked towards the officer, but he kept his hands behind his back.[7] Then the officer saw Vigue make a shaking motion, as if he had dropped something from his hands behind his back.[8] When Vigue arrived at the officer's patrol car, the officer examined the ground where Vigue had been standing, and he discovered five rocks of crack cocaine.[9]

Based on these facts, Vigue was convicted of tampering with physical evidence, on the theory that he "suppressed" or "concealed" the cocaine.[10] This Court reversed Vigue's conviction:

> The fact that Vigue intended to make it harder for [the officer] to detect the cocaine does not mean that Vigue actually succeeded in "suppressing or concealing" the cocaine when he tossed or dropped it to the ground. Indeed, under the facts of

this case, no suppression or concealment occurred: [the officer] observed Vigue's action and was alerted to the possibility that something might be on the ground at the spot where Vigue had been standing.

*Vigue*, 987 P.2d at 210.

After we concluded that Vigue's actions did not amount to the completed crime of evidence tampering, we then addressed—and rejected—the possibility that the facts of Vigue's case might support a conviction for the lesser offense of *attempted* evidence tampering:

> One could argue that, even if Vigue did not succeed in suppressing or concealing the cocaine, he nevertheless tried to do so, and so his conviction should be reduced to attempted evidence-tampering. Again, this would make sense if we interpreted the terms "suppress" and "conceal" broadly. But ... we are persuaded to give a narrow interpretation to the terms "suppress" and "conceal." We are convinced that a broad reading of these terms would lead to results that are inexplicably harsh and probably not within the legislature's intent. ... As [other state courts noted], if the words "suppress" and "conceal" are interpreted to cover actions such as tossing evidence to the ground, or tossing evidence out of a car window, or hiding evidence in one's clothing, then minor possessory offenses would often be converted to felonies with little reason.

*Vigue*, 987 P.2d at 210–11.

Thus, *Vigue* apparently rejects the State's theory of prosecution in Stepovich's case.

The State attempts to distinguish *Vigue* by noting that Stepovich discarded the slip of cocaine while he was standing behind a Dumpster, out of Officer Lockwood's direct view. The State analogizes Stepovich's case to a number of cases from other jurisdictions where courts upheld the evidence-tampering

---

5. *See Love v. State*, 457 P.2d 622, 634 (Alaska 1969) (holding that, for instances of non-constitutional error, the test for harmlessness is whether the appellate court "can fairly say that the error did not appreciably affect the jury's verdict").

6. *Vigue*, 987 P.2d at 205.

7. *Ibid.*

8. *Ibid.*

9. *Ibid.*

10. *Id.* at 204.

convictions of defendants who swallowed drugs or threw drugs down drains or into toilets.

But whether a defendant's conduct constitutes evidence tampering (or attempted evidence tampering) does not hinge on whether the defendant's conduct occurred in the direct view of the police. Rather, the question is the degree to which the defendant's conduct impaired the recovery or availability of the evidence.

This Court's opinion in *Anderson v. State*, 123 P.3d 1110 (Alaska App.2005), is instructive on this point. In *Anderson*, the police were chasing the car in which Anderson was riding. During the chase, Anderson tossed a handgun, as well as ammunition and the magazine for the handgun, out of the car window.[11] This Court held that Anderson's conduct did not constitute the offense of evidence tampering.

We first re-affirmed our holding in *Vigue* that a conviction for evidence tampering must be supported by more than proof that the defendant tossed away evidence while being approached or chased by the police.[12] We then explained that the test for whether a defendant's conduct constitutes evidence tampering is "whether the defendant disposed of the evidence in a manner that destroyed it or that made its recovery substantially more difficult or impossible."[13]

We then gave an example of conduct that might occur in full view of the police, but would nevertheless constitute evidence tampering: a defendant who poured a bag of powder cocaine out of the window of a moving car.[14]

To analyze the facts of Stepovich's case under our decisions in *Vigue* and *Anderson*, we must ask whether Stepovich's actions made it impossible or substantially more difficult for Officer Lockwood to recover the slip of cocaine. Even though Stepovich did step behind the Dumpster, out of Lockwood's direct view, Lockwood saw Stepovich do this. Moreover, Lockwood suspected—from the way that Stepovich held his hands when he went behind the Dumpster, and then when he emerged again—that Stepovich had discarded something. Lockwood, like the officer in *Vigue*, quickly went behind the Dumpster, observed the slip of cocaine, and recovered it.

True, Stepovich was only charged with attempt, and not the completed crime of evidence tampering. But in *Vigue* we explained why the law will not allow a conviction for attempt in these circumstances, and we now re-affirm what we said in *Vigue*.

Accordingly, the State's evidence is not sufficient to support Stepovich's conviction for attempted evidence tampering.

*Conclusion*

For the reasons explained here, we AFFIRM Stepovich's conviction for fourth-degree controlled substance misconduct (possession of cocaine), but we REVERSE Stepovich's conviction for attempted evidence tampering.

---

11. *Anderson,* 123 P.3d at 1117.

12. *Id.* at 1119.

13. *Ibid.*

14. *Ibid.*