NOTICE

*The text of this opinion can be correct before the opinion is published in the*
*Pacific Reporter.  Readers are encouraged to bring typographical or other*
*formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JEFFREY ERIC BRIGMAN,

                    Appellant,

          v.

STATE OF ALASKA,

                    Appellee.

Court of Appeals No. A-12727
Trial Court No. 3AN-13-09635 CR

O P I N I O N

No. 2724 — April 22, 2022

Appeal from the Superior Court, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances:  Justin N. Gillette, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant.  Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before:  Allard, Chief Judge, Harbison, Judge, and Mannheimer, Senior Judge.[*]

Judge ALLARD.

---

[*]     Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Jeffrey Eric Brigman was convicted, following a jury trial, of felony driving under the influence.[1] In his original appeal, Brigman argued that the superior court erred when it failed to suppress an out-of-court eyewitness identification that resulted from a showup procedure.[2] Because the superior court had not analyzed the showup identification under the Alaska Supreme Court's newly adopted *Young* standard, we remanded Brigman's case so that the superior court could conduct that analysis.[3]

On remand, the superior court found that the showup identification was sufficiently reliable under *Young* and was therefore admissible at trial. Brigman now appeals that ruling. For the reasons explained here, we conclude that the superior court did not err in its *Young* analysis.

*Relevant facts*

Around 10:00 p.m. on a September evening in 2013, a woman stepped out of a gas station in Anchorage to find that her car had been stolen. A few minutes later, the driver of the stolen car crashed into a sidewalk area near 10th Avenue and Juneau Street.

Thomas Jenkins, who was walking his dog on 10th Avenue, witnessed the crash, and he approached the driver to offer assistance. Jenkins believed, based on his contact with the driver, that the driver was under the influence of something. Jenkins

---

[1]   AS 28.35.030(n).

[2]   A showup is essentially a single-person lineup. A single suspect is presented to a witness to see if the witness can make an identification. These often occur at or near the scene of a crime soon after it takes place. *See Brigman v. State*, 2020 WL 704854 (Alaska App. Feb. 12, 2020) (unpublished).

[3]   *Id.* (citing *Young v. State*, 374 P.3d 395 (Alaska 2016)).

spoke to the driver briefly before leaving to retrieve his cell phone and call 911.[4]  The driver left the scene before Jenkins returned.

When Jenkins called 911, he described the driver as a man with black hair, gray clothing, and wearing a zippered hoodie.  Jenkins thought the man was white, but he could not be sure.  Jenkins also told the 911 operator that the man might have walked south on Ingra Street when he left the scene.

Almost immediately after this 911 call, Officer Angelina Fraize spotted and detained a white male suspect with dark hair and dark clothing walking south on Ingra Street, approximately a block from the crash scene.  This suspect was Brigman.  At trial, Officer Fraize described Brigman as "obviously intoxicated," "sweaty," and "nervous."

Another officer, Steven Childers, brought Jenkins to where Officer Fraize was holding Brigman, so that the police could conduct a showup identification — asking Jenkins if he could identify Brigman as the driver he had spoken to several minutes earlier.  To facilitate this showup, Officer Fraize had Brigman stand next to her police car in handcuffs.

Before asking Jenkins whether he could identify the man standing next to the patrol car, Officer Childers specifically instructed Jenkins that this man might or might not be the right person.  Jenkins identified Brigman as the driver of the crashed vehicle.

At trial, Jenkins testified to his identification of Brigman.  Jenkins testified that Brigman was wearing a gray hoodie at the time of the crash.  (Brigman was not

---

[4]  It was evening when Jenkins observed the driver.  Jenkins testified that there was a street lamp about twenty-five feet from where the crash occurred that offered some additional light by which to see.

wearing a hoodie in the photograph taken of him at the scene of the showup identification.)

Another eyewitness to the crash also identified Brigman at trial. This second eyewitness testified that he was drunk when he witnessed the crash and that the police never asked him to participate in a showup identification or any other out-of-court identification. Instead, at trial, this eyewitness was shown the photograph of Brigman taken during the showup identification with Jenkins. This second eyewitness identified Brigman as the driver of the crashed vehicle, although he stated that he could not be sure. The eyewitness had previously described the driver as a white male adult wearing a gray shirt with wavy, dark-colored, shoulder-length hair. (Brigman's hair in the photograph is shorter than shoulder-length.)

Brigman was convicted at trial.

*Brigman's motion to suppress and our remand to the superior court*

Prior to trial, Brigman moved to suppress the results of the showup identification by Jenkins, arguing that the showup procedure was improperly suggestive and that the resulting identification was therefore unreliable.

The superior court held an evidentiary hearing on this motion. After evaluating the showup under the then-existing legal test set forth in *Anderson v. State* and *Manson v. Braithwaite*,[5] the court ruled that the result of the showup was admissible.

However, after the superior court made its ruling, the Alaska Supreme Court adopted a new test for evaluating the reliability of out-of-court police identification

---

[5]    *Anderson v. State*, 123 P.3d 1110, 1116 (Alaska App. 2005); *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).

procedures in *Young v. State*.[6] In Brigman's initial appeal, the State conceded that the *Young* test applied to Brigman's case, and we therefore remanded the case to the superior court to conduct the appropriate analysis under *Young*.[7]

*An overview of the Young test*

In *Young v. State*, the Alaska Supreme Court held that the *Anderson/Braithwaite* test for evaluating the reliability of out-of-court eyewitness identifications did not adequately protect a defendant's right to due process under the Alaska Constitution.[8] In its place, the court adopted a new test that was modeled after the test set forth by the New Jersey Supreme Court in *State v. Henderson*.[9]

The supreme court had two principal reasons for adopting this new test. First, the *Young* test corrected some of the deficiencies of the former test by requiring trial judges to consider scientifically grounded variables when assessing the reliability of an out-of-court identification procedure conducted by the police.[10] Second, in cases where the trial court does not order suppression of an out-of-court identification, the

---

[6]    *Young*, 374 P.3d at 426-28.

[7]    *Brigman*, 2020 WL 704854, at *1.

[8]    *Young*, 374 P.3d at 412.

[9]    *Id.* at 417-27 (citing *State v. Henderson*, 27 A.3d 872 (N.J. 2011)).

[10]    *Id.* at 412-29; *see Henderson*, 27 A.3d at 918-22 (outlining the problems inherent in the prior eyewitness identification test under *Braithwaite* and explaining the variables to be considered under the new test).

*Young* test prescribed improved jury instructions to assist jurors in evaluating the out-of-court identification according to these scientifically grounded variables.[11]

Under *Young*, a trial court is required to consider two sets of variables when evaluating whether to suppress the results of an out-of-court eyewitness identification. The supreme court referred to the first group of variables as "system variables" (those variables that are within the control of the law enforcement officers who are conducting the identification procedure) and "estimator" variables (those variables intrinsic to the event that are not within the control of law enforcement).[12]

Under the *Young* test, a defendant who seeks suppression of an out-of-court identification must show "some evidence," tied to a system variable, tending to show that the identification procedure was tainted by suggestiveness that could lead to a mistaken identification.[13] System variables include both how the identification was structured (*e.g.*, whether it was the product of a showup, a lineup, or a photographic array) and the procedures surrounding the identification (*e.g.*, the composition of the lineup, whether the witness received properly neutral pre-identification instructions or, instead, improper confirmatory feedback). *Young* outlines the following non-exhaustive list of system

---

[11]   *Young*, 374 P.3d at 428; *see Henderson*, 27 A.3d at 924-26 (directing the development of enhanced jury instructions).

[12]   *Young*, 374 P.3d at 416-25 (discussing variables).

[13]   *Id.* at 427. The supreme court explained that a suppression motion must generally be based on a system variable because state action is required to trigger a due process suppression analysis. *Id.*; *see also Nichols v. Eckert*, 504 P.2d 1359, 1362 (Alaska 1973) ("For [the due process] clause to apply there must be state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection."). *But see Henderson*, 27 A.3d at 920 (recognizing this same requirement, but pointing to one New Jersey case, *State v. Chen*, 208 N.J. 307 (2011), where conduct by a private actor was sufficient to trigger an evidentiary hearing).

variables for a trial court to consider when determining whether a defendant has met this initial burden of showing "some evidence" of suggestiveness:

1. Blind Administration. Was the identification procedure performed double-blind (*i.e.*, was the person administering the procedure kept ignorant of the identity of the person who was suspected)? If double-blind administration of a photo lineup or physical lineup was impractical, did the police at least use a technique to ensure that the administrator had no knowledge of where the suspect appeared in the photo array or lineup?[14]

2. Pre-identification Instructions. Did the administrator provide neutral pre-identification instructions to the witness being asked to make the identification, warning the witness that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?[15]

3. Lineup Construction. Did the photo array or lineup contain only one suspect embedded among at least five innocent fillers? Did the suspect stand out from other members of the lineup?[16]

---

[14]    *Young*, 374 P.3d at 417-18; *see Henderson*, 27 A.3d at 897 ("The consequences are clear: a non-blind lineup procedure can affect the reliability of a lineup because even the best-intentioned, non-blind administrator can act in a way that inadvertently sways an eyewitness trying to identify a suspect. An ideal lineup administrator, therefore, is someone who is not investigating the particular case and does not know who the suspect is.").

[15]    *Young*, 374 P.3d at 418-19; *see Henderson*, 27 A.3d at 897 ("Pre-lineup instructions help reduce the relative judgment phenomenon . . . . Without an appropriate warning, witnesses may misidentify innocent suspects who look more like the perpetrator than other lineup members. . . . In one experiment, 45% more people chose innocent fillers in target-absent lineups when administrators failed to warn that the suspect may not be there.").

[16]    *Young*, 374 P.3d at 419-20; *see Henderson*, 27 A.3d at 897 ("Properly constructed
(continued...)

4. <u>Feedback and Recording Confidence.</u>  Did the witness receive any feedback from the police or from another witness before, during, or after the identification procedure?  If the witness made a statement regarding their level of confidence in the identification, did the administrator record the witness's statement of confidence immediately after the identification, before any possibility of confirmatory feedback?[17]

5. <u>Showups.</u>  Was the witness identified in a showup?  Did the police perform the showup more than two hours after the event?  Did the police warn the witness that the person they were about to view may not be the perpetrator, and that the witness should not feel compelled to make an identification?[18]

6. <u>Multiple Viewings.</u>  Was the witness exposed to the suspect after the crime but before making the identification?  Did the witness fail to identify the suspect in an earlier procedure?[19]

---

[16]  (...continued)
lineups test a witness'[s] memory and decrease the chance that a witness is simply guessing.").

[17]  *Young*, 374 P.3d at 420; *see Henderson*, 27 A.3d at 900 ("Confirmatory feedback can distort memory.  As a result, to the extent confidence may be relevant in certain circumstances, it must be recorded in the witness'[s] own words before any possible feedback.  To avoid possible distortion, law enforcement officers should make a full record — written or otherwise — of the witness'[s] statement of confidence once an identification is made.  Even then, feedback about the individual selected must be avoided.").

[18]  *Young*, 374 P.3d at 420-21; *see Henderson*, 27 A.3d at 903 ("By their nature, showups are suggestive and cannot be performed blind or double-blind.").

[19]  *Young*, 374 P.3d at 421; *see Henderson*, 27 A.3d at 900 ("Viewing a suspect more than once during an investigation can affect the reliability of the later identification.  The problem . . . is that successive views of the same person can make it difficult to know
(continued...)

Again, *Young* states that a defendant need only show "some evidence" of suggestiveness from the above non-exhaustive list of system variables in order to obtain an evidentiary hearing on their suppression claim.[20]

If the defendant establishes the need for an evidentiary hearing, the burden of production shifts to the State. The State must offer evidence that, even though the eyewitness identification procedure was potentially subject to suggestive influences arising from system variables, the identification is nevertheless reliable.[21] However, the ultimate burden of persuasion remains with the defendant.[22] In order to obtain suppression of the out-of-court identification (and any subsequent in-court identification by the witness), the defendant must show a "very substantial likelihood of irreparable misidentification."[23]

---

[19] (...continued)
whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure.").

[20] *Young*, 374 P.3d at 427.

[21] *Id.* The State can also offer proof to rebut the defendant's claim of suggestiveness. For example, if the defendant claims that there is "some evidence" that the witness received confirmatory feedback, the State may respond by introducing evidence to the contrary. If the court determines that the confirmatory feedback did not occur and that no other evidence of suggestiveness from a system variable otherwise exists, then suppression can be denied without additional analysis of the estimator variables. *See Henderson*, 27 A.3d at 920 ("[At the hearing, t]he State must then offer proof to show that the proffered eyewitness identification is reliable — accounting for system and estimator variables — subject to the following: the court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless.").

[22] *Young*, 374 P.3d at 427.

[23] *Id.* (quoting *Henderson*, 27 A.3d at 920).

To evaluate whether the defendant has made the required showing, a trial court must consider both the system variables and the estimator variables described in *Young*.[24] Again, estimator variables are those factors intrinsic to the event and not within the control of law enforcement, such as environmental variables and the characteristics of the witness and the suspect.[25] Some examples of estimator variables the trial court must consider include:

1. Stress. Did the witness view the perpetrator under particularly stressful conditions?[26]

2. Weapons Focus. Was a weapon, or another unusual or distracting object, visible during the time the witness was viewing the perpetrator?[27]

3. Duration of View. How long was the witness able to see the perpetrator?[28]

---

[24] *Id.*

[25] *Id.* at 417.

[26] *Id.* at 422 ("Acknowledging the negative effect of stress on the reliability of eyewitness identifications may help jurors counteract the common misconception that faces seen in highly stressful situations can be burned into a witness's memory." (internal quotation marks and citation omitted)).

[27] *Id.* at 422-23; *see Henderson*, 27 A.3d at 904-05 ("When a visible weapon is used during a crime, it can distract a witness and draw his or her attention away from the culprit.").

[28] *Young*, 374 P.3d at 423.

4. <u>Environmental Conditions of View.</u> What environmental conditions, such as distance and lighting, may have affected the witness's ability to view the perpetrator?[29]

5. <u>Witness Characteristics.</u> Were there any characteristics of the witness, such as mental and physical health, age, vision, or alcohol or drug use, that may have compromised the witness's ability to see and identify the perpetrator?[30]

6. <u>Perpetrator Characteristics.</u> Was the perpetrator disguised or otherwise difficult to describe? Has the suspect's appearance changed since the crime?[31]

7. <u>Race and Ethnicity Bias.</u> Does the case involve a cross-racial identification?[32]

8. <u>Memory Decay/Retention Interval.</u> How much time passed between the crime and the identification procedure?[33]

9. <u>Co-Witnesses.</u> Did the witness discuss the identification or receive information about the suspect from co-witnesses or other non-state actors?[34]

---

[29] *Id.*

[30] *Id.* at 423-24.

[31] *Id.* at 424 ("Masks, sunglasses, hats, hoods, and other things that hide the hair and hairline affect witnesses' ability to accurately identify a perpetrator.").

[32] *Id.*

[33] *Id.* at 424-25.

[34] *Id.* at 425.

This is not a complete list of the estimator variables that a trial court should consider.[35] The *Young* test recognizes that the scientific research pertaining to eyewitness identification continues to evolve and that trial courts should take into account this developing research when assessing the reliability of eyewitness identifications.[36]

One question that the *Young* opinion did not directly answer is whether the *Biggers* factors — the factors that were used in the former *Anderson/Braithwaite* test — are still valid factors to consider under the new test.

Under *Anderson/Braithwaite*, a defendant was required to show that the procedures used to obtain the out-of-court eyewitness identification were "unnecessarily suggestive."[37] Once this showing was made, the trial court was required to consider "the totality of the circumstances" in determining whether the identification was nevertheless reliable enough to be admitted at trial.[38] In assessing the totality of the circumstances, the court was required to consider the five factors articulated in *Neil v. Biggers*.[39] These factors were: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the suspect; (4) the level of certainty demonstrated by the witness during the identification

---

[35]   *Id.* at 427.

[36]   *Id.* ("Because of this, trial courts should not hesitate to take expert testimony that explains, supplements, or challenges the application of these variables to different fact situations.").

[37]   *Anderson v. State*, 123 P.3d 1110, 1116 (Alaska App. 2005); *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).

[38]   *Anderson*, 123 P.3d at 1116.

[39]   *Braithwaite*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

procedure; and (5) the time interval between the crime and the out-of-court identification.[40]

Although the *Young* opinion did not directly address the current status of the *Biggers* factors, the supreme court indicated that its new test was modeled after the test adopted by the New Jersey Supreme Court in *Henderson*.[41] And in *Henderson*, the New Jersey Supreme Court made clear that the *Biggers* factors should still be considered among the estimator variables, albeit with some important caveats.[42] The New Jersey Supreme Court cautioned trial courts to be aware of the scientific criticism that the *Biggers* factors have generated. Chief among these criticisms is *Biggers*'s over-emphasis on a witness's level of certainty.[43]

Scientific studies have shown that a witness's level of certainty is a poor indicator of the reliability of the witness's identification — in part, because a witness's level of certainty is often a product of suggestive procedures such as confirmatory feedback.[44] Therefore, the New Jersey Supreme Court directed trial courts to consider whether the witness expressed high confidence in the identification "*before* receiving any feedback or other [confirmatory] information."[45] The New Jersey Supreme Court also encouraged trial courts to consider using protective orders to block the government from introducing evidence of a witness's high degree of certainty, even when the witness's

---

[40] *Biggers*, 409 U.S. at 199-200.

[41] *Young*, 374 P.3d at 427.

[42] *State v. Henderson*, 27 A.3d 872, 918-22 (N.J. 2011).

[43] *Id.* at 918.

[44] *Id.*

[45] *Id.* at 922 (emphasis added).

out-of-court identification is not suppressed, if the witness's level of certainty appears to have been influenced by suggestive procedures.[46]

Another criticism of the *Biggers* framework, discussed in both *Henderson* and *Young*, is that three of the *Biggers* factors — the witness's opportunity to view the crime, the witness's degree of attention, and their level of certainty — often rely solely on the witness's self-reporting.[47] Studies have shown that witnesses frequently overestimate how long they saw the perpetrator and their degree of attention to the perpetrator.[48] They also often underestimate the distance between themselves and the perpetrator.[49] Therefore, to the extent possible, a trial court should use objective measures when assessing these estimator variables rather than rely exclusively on a witness's self-reporting.

Ultimately, the *Young* test requires a trial court to decide whether the defendant has shown, by a preponderance of the evidence, that the out-of-court identification procedure is tainted by a "very substantial likelihood of irreparable misidentification."[50] The trial court's analysis of this question must be based on a

---

[46] *Id.* at 925; *cf. State v. Lawson*, 291 P.3d 673, 695 (Or. 2012) (suggesting that trial courts can satisfy Evidence Rule 403 by admitting an eyewitness's out-of-court identification but excluding the accompanying statement regarding the witness's level of certainty, because such statements can often be persuasive to jurors but actually have limited reliability).

[47] *Young v. State*, 374 P.3d 395, 425-26 (Alaska 2016); *Henderson*, 27 A.3d at 918.

[48] *Young*, 374 P.3d at 420 n.140, 423.

[49] *Id.* at 423.

[50] *Id.* at 427 (quoting *Henderson*, 27 A.3d at 920).

consideration of both the system variables and the estimator variables.[51]  The court's analysis should also be informed by accepted scientific studies regarding the inherent perils that can lead to flawed eyewitness identifications.[52]

If the trial court finds that the defendant has shown a "very substantial likelihood of irreparable misidentification," the trial court must suppress the out-of-court identification and preclude the witness from providing any in-court identification.[53]  If the trial court finds that the defendant has not made the requisite showing, the court must still provide the kind of tailored jury instructions described in *Young* to ensure that jurors understand the factors that can affect the reliability of an out-of-court eyewitness identification.[54]

### The *Young* test applied to the facts of Brigman's case

Here, there is no question that Brigman met his initial burden of showing "some evidence" of suggestiveness related to a system variable, because the out-of-court identification in Brigman's case was obtained through a showup — an inherently suggestive procedure.

In a showup, a single suspect is presented to a witness, and the witness is asked whether they can make an identification.  As courts have frequently

---

[51]  *Id.*

[52]  *Id.*

[53]  *Id.*

[54]  *Id.* at 428; *see Henderson*, 27 A.3d at 920 ("If the evidence is admitted, the court should provide appropriate, tailored jury instructions . . . .").

acknowledged, showups are "inherently suggestive."[55] By their very nature, they cannot be performed using a blind or double-blind format.

Moreover, in contrast to lineups and photographic arrays, where a witness with a faulty memory might well pick someone other than the suspect, every positive identification in a showup implicates the suspect.[56] As the Alaska Supreme Court noted in *Young*, "Showups seemingly provide little protection against witnesses who are inclined to guess, as witnesses participating in showups tend to base their identifications on clothing."[57] Research also shows that "an innocent suspect who resembles the actual perpetrator is more likely to be incorrectly identified in a showup than in a lineup."[58]

Despite these problems, showups still play a role in the criminal justice system because they are often the best way to determine the direction of an investigation under exigent circumstances. For example, in Brigman's case, the police needed to learn whether they had apprehended the intoxicated driver who had just fled the crash site or whether they should continue their search. Because showups are useful and often necessary, the out-of-court identifications resulting from showups remain potentially admissible under the *Young* test.

But under the *Young* test, the fact that a showup may have been necessary under the circumstances does not end the analysis. Instead, a trial court is required to assess all of the relevant system and estimator variables, with particular attention to how

---

[55] *Anderson v. State*, 123 P.3d 1110, 1117 (Alaska App. 2005).

[56] *Young*, 374 P.3d at 421.

[57] *Id.*

[58] *Id.*

the showup was conducted and when it occurred.[59] Studies have shown that showups are often most reliable if they are conducted immediately after the crime when the witness's memory is fresh.[60] But research also shows that the likelihood of a misidentification at a showup increases significantly in as little as two hours after the event.[61]

In addition, studies have shown that the pre-identification instructions the witness receives are an important influence on the reliability of the witness's identification.[62] To increase the chances of reliability, a witness should be instructed that the person they are about to view may or may not be the culprit and that they should not feel compelled to make any identification.[63]

In Brigman's case, the superior court found that the showup occurred within minutes of the time when the witness, Thomas Jenkins, encountered and conversed with the driver of the crashed vehicle. The record supports this finding, and the parties appear to agree that less than thirty minutes passed from the time of the crash to the time of the showup.

The superior court also found that Officer Childers provided the appropriate pre-identification instructions to Jenkins. Prior to the identification, Childers instructed Jenkins that the person in custody might or might not be the driver. These instructions were recorded and are not in dispute.

---

[59]  *Id.* at 427.

[60]  *Id.* at 421.

[61]  *Id.*

[62]  *Id.* at 418-19.

[63]  *Id.*

Based on the immediacy of the showup and the fact that Jenkins received neutral pre-identification instructions, the superior court found that the showup identification that occurred in Brigman's case was "the type the Supreme Court had in mind when it said [that showups] can be reliable."

But, as the superior court recognized, finding that the showup was conducted in an appropriately neutral form is not the end of the analysis under *Young*. The superior court still needed to assess the estimator variables to determine whether, notwithstanding the immediacy of the showup and the result-neutral pre-identification instructions, there was a "very substantial likelihood of irreparable misidentification."[64]

The superior court's order provides an in-depth analysis of the estimator variables in Brigman's case. The court found, for example, that "there is no suggestion that the witness's stress level was particularly high[,] because he was not in any danger and his desire was to help the driver of the vehicle that had just crashed in front of him." The court also found that, although the interaction between Jenkins and the driver was short, their encounter was face-to-face and in an area that was well-lit by a streetlight. There were no weapons or unusual or distracting objects present, and the driver was not wearing a hat or other disguise. The court noted that there was no issue of cross-racial identification bias, as both Jenkins and the driver were white. In addition, Jenkins, a sixty-one-year-old man, was wearing his eyeglasses and was not under the influence of alcohol or medication. The court further found that Jenkins had acted responsibly by first checking on the driver of the vehicle and then calling 911 and providing a relatively detailed description. The court noted that there were some discrepancies regarding Jenkins's description of the driver's clothing and hair. But the court found that these

---

[64] *See id.* at 427.

discrepancies were explainable, that they did not undermine the reliability of the identification, and that these discrepancies could be understood and considered by the jury.

In sum, after conducting a thorough analysis under *Young* of how and when the showup occurred, and after analyzing the applicable estimator variables, the court concluded that Brigman had failed to show that there was a very substantial likelihood of irreparable misidentification, and thus the showup identification was sufficiently reliable to be introduced into evidence.

On appeal, Brigman focuses on the discrepancies between Jenkins's description of the driver and what Brigman looked like at the showup. According to Brigman, these discrepancies were significant enough that the superior court should have found the identification unreliable.

We disagree. In his initial 911 call, Jenkins described the driver as a man, likely white, with black hair, gray clothing, and a zipped hoodie. Based on this description, Officer Fraize stopped Brigman, a white man with black hair and gray/dark clothing. It is true that Brigman was not wearing a hoodie, and we agree with Brigman that the absence of a hoodie casts some doubt on the reliability of Jenkins's identification, and that this was a proper subject for cross-examination at trial. But this one discrepancy does not defeat the superior court's conclusion that Brigman failed to show a very substantial likelihood of irreparable misidentification, given the other system and estimator variables at play in this case.

Brigman also asserts that Jenkins misidentified Brigman's hair. According to Brigman, Jenkins described the driver as having hair that was longer, curlier, and wavier than Brigman's. But the transcript page that Brigman cites does not support this

claim. Instead, it appears that it was the *other* eyewitness who originally described the driver as having "shoulder-length" wavy hair.

The record does, however, show that Jenkins himself acknowledged that his recollection of the driver's hair differed somewhat from the way Brigman's hair looked at the time of the showup. After Jenkins identified Brigman as the driver of the crashed vehicle, Jenkins noted that the driver's hair "wasn't messed up [like Brigman's] at the time." But according to the record, Brigman was sweaty and nervous by the time of the showup and, as the superior court noted, there was a light rain or mist "which could have altered the look of a person's hair." We therefore find no error in the superior court's discounting of this supposed discrepancy.

Ultimately, under *Young*, it is the defendant who bears the burden of proving that the system variables and estimator variables applicable to the case give rise to a very substantial likelihood of misidentification.[65] We find no error in the superior court's conclusion that Brigman did not meet this burden.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[65] *Id.*